KIYOMI ASADA, BEVERLY TADAKI, Individually and on behalf of all other persons similarly situated, Plaintiffs-Appellees, *v.* FRANKLIN SUNN, Acting Director, Department of Social Services and Housing, State of Hawaii, and WAYNE S. OMURA, Services Program Development Administrator, State of Hawaii, Defendants-Appellants

NO. 8733

(CIVIL NO. 63056)

JUNE 24, 1983

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, JJ.,
AND CIRCUIT JUDGE CHANG,
ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY PADGETT, J.

This is an appeal by the defendants-appellants from a judgment entered pursuant to an order granting summary judgment in favor of the plaintiffs-appellees. We reverse.

We begin by noting we are faced with a voluminous record brought up from the court below, consisting of three thick volumes. Because appellees' complaint did not contain a short and plain statement of their claim, as required by Rule 8(a)(1),

HRCP, because over 200 pages of uncertified documents were attached to appellees' motion for summary judgment in violation of Rule 56(e), HRCP, and because appellees' counsel filed motions, such as a motion to strike appellants' notice of appeal over appellants' objection, which were clearly beyond the power of the trial court, and because the appellants' counsel responded in many instances in like manner, we have been faced with the burdensome task of attempting to separate the wheat from the chaff. We have found very little wheat and a great deal of chaff. It appears to us that the real issues in this case are relatively simple and straightforward and should have been so approached by counsel.

There are a plethora of procedural problems involved arising out of the way the respective counsel actually approached this case. We will not attempt to solve those problems in this opinion since they are not germane to the disposition of the judgment below. We would urge, however, that counsel, on remand, follow the Hawaii Rules of Civil Procedure and cooperate so as to present the court below, and, if this case should be returned on appeal again, this court, with an intelligible record.[1]

As near as we can tell from the record in this case, the individual plaintiff, Kiyomi Asada, was a recipient of Aid to Families with Dependent Children benefits. The appellants were state officials of the Department of Social Services and Housing responsible for paying those benefits. The Department had promulgated a regulation, being Hawaii Public Welfare Manual § 5007.06, which read as follows:

*Day Care Payments*

a. The amount of payment shall not exceed $100 a month tuition or basic fee per child for cash payments.

1. *Exception:* Day care payments in excess of $100 per month per child may be negotiated and allowed with

---

[1] We add that this is one of a series of cases involving the same counsel on both sides which are winding their way through the courts, several of which have reached us. From our examination of the records in those cases, counsel have pursued the same line of conduct in those cases that necessitated these comments in this case.

approval by the Director to meet the needs of special groups of children or fees negotiated through Purchase of Service contracts.

2. Approval of cost over $100 for tuition or basic fee for cash payments for child care requires Branch supervisory approval.

b. Registration fees and supplies shall be provided as required by the facility. This may include a tuition deposit which can be applied to the child's last month's tuition, registration fees, costs for field trips or programs the child participates in as part of the facility's regular program, etc.

c. Transportation cost between the child's home and the day care facility. This includes HeadStart program transportation costs if eligible under M.S. 5007.03.

d. If the recipient of service costs is agreeable but subsequently fails to secure a receipt of payment within the period for which payment was approved and made, payment beyond the period initially approved shall *not* be authorized.

Appellee Asada claimed that she had actual expenses in excess of $100 per month for tuition or basic fees for child care; that she was entitled to have her actual expenses taken into consideration in determining her need; that the effect of the quoted regulation was to limit the amount taken into consideration in determining her need to $100 per month per child and that, therefore, the regulation was contrary to Title 42 U.S.C. § 602(a)(7).

Appellants, on the contrary, contended that the regulation sets a $100 standard but gives an opportunity for the recipient to establish, to the social worker (Branch Supervisor) and, on appeal at a fair hearing pursuant to statute, that she reasonably needs more than $100 per month per child for the purpose of child care.

The court below granted appellees' motion for summary judgment on October 5, 1981, holding that:

. . . as a matter of law child care costs actually paid by working . . . [A.F.D.C.] recipients are a mandatory work expense under the Social Security Act, 42 U.S.C. § 602(a)(7) . . . [and] to the extent that Defendants do not pay the entire costs of the child care out of Title XX funds,

Defendants must provide an A.F.D.C. work expense under 42 U.S.C. § 602(a)(7).

The court further ordered retroactive benefits for appellees, but reserved for a later time a decision on the period for which those benefits would be provided.

The court entered two additional orders on March 22, 1982. The first order established the period for which appellants were ordered to pay retroactive benefits to the appellees. The second order granted appellees' motion to join party plaintiff Tadaki. We do not pass on the correctness of either of those orders *or* of any other order not expressly dealt with in this opinion.

Appellants filed their notice of appeal of both the October 5, 1981 and March 22, 1982 orders on April 20, 1982. The court struck, over their objection, appellants' notice of appeal relating to the October 5, 1981 order as untimely, holding that that order was a final, appealable order. We disagree with that holding and action.

We have held that a decision reserving determination of benefits for a later time is not a final order. *Hawaii Laborers Training Center* v. *Agsalud,* 65 Haw. 257, 650 P.2d 574 (1982). Furthermore, we have previously construed Rule 54(b), HRCP, so that:

> where the disposition of the case is embodied in several orders, no one of which embraces the entire controversy but collectively does so, "it is a necessary inference from Rule 54(b) that the orders collectively constitute a final judgment and . . . entry of the last of the series of orders gives a finality and appealability to all."

*Island Holidays, Inc.* v. *Fitzgerald,* 58 Haw. 552, 561, 574 P.2d 884, 890 (1978) (quoting *City & County of Honolulu* v. *Midkiff,* 57 Haw. 273, 275, 554 P.2d 233, 234-35 (1976)). Moreover, as we interpret Rule 73(a), HRCP, the court can strike a notice of appeal in only two situations: where the parties agree to do so prior to the docketing of an appeal, and where the appellant moves, and gives notice of such motion, to strike the notice of appeal. Neither was the situation here. We thus hold that the circuit court exceeded its powers in striking the notice of appeal, and agree with appellants' contention that they timely and correctly appealed.

At oral argument, appellees' counsel reaffirmed that the appellees' position is that if there were two child care facilities, both equal in the care provided, and both equally convenient to Appellee Asada and one charged $100 per month per child while the other charged $300 per month per child, she had the right, as a matter of law under 42 U.S.C. § 602(a)(7), to send her child or children to the $300 a month facility and that the State would have to make up the difference, because so long as she actually expended the money and "any" child care expenditure was reasonably necessary to her earning income, she·was entitled to have her actual expenses considered under the income maintenance program.[2] In other words, her counsel contends that the statute gives her a blank check for child care expenses on the State's treasury.

Title 42 U.S.C. § 602(a)(7) reads in part as follows:

A State plan for aid and services to needy families with children must . . . provide that the State agency shall, in determining need, take into consideration . . . any expenses reasonably attributable to the earning of any such income;

. . . .

The section just quoted was construed by the United States Supreme Court in *Shea v. Vialpando,* 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974). In that case, the Supreme Court said at 416 U.S. 260:

By its terms, § 402(a)(7) [now § 602(a)(7)] requires the consideration of "any" reasonable work expenses in determining eligibility for AFDC assistance. In light of the evolution of the statute and the normal meaning of the term "any," we read this language as a congressional directive that no limitation, *apart from that of reasonableness,* may be placed upon the recognition of expenses attributable to

---

[2] Apparently, the appellants handle child care expenses by way of reimbursement by the social services unit involved rather than as a basis for determining need under the income maintenance program. At oral argument appellees appeared to be arguing that those expenses must be handled under income maintenance. So long as the net effect is the same, we think the appellants may handle the expenses either way.

the earning of income. . . .
(Emphasis supplied.)

In that case, the state of Colorado had fixed a maximum amount which could be considered in any case. In holding that maximum to violate the statute, the Supreme Court said:

> It is, of course, not the adoption of a standardized work-expense allowance *per se* which we hold to be violative of § 402(a)(7) of the Act, but the fact that the standard used by Colorado is in effect a maximum or absolute limitation upon the recognition of such expenses. As the Court of Appeals correctly observed, a standard allowance would be permissible, and would substantially serve petitioners' interests in administrative efficiency, if it provided for individualized consideration of expenses in excess of the standard amount.

416 U.S. at 265.

Here, when a change in Appellee Asada's needs was proposed, she was notified and she had a "fair hearing" at which she was represented by counsel. At that hearing, one of the questions passed on was whether excess child care expenses were allowable as a work expense under "income maintenance." The hearing officer ruled that they were not, but that such excess child care expenses were a "social service item" which must be determined by the social services unit under § 5007.06, HPWM. The affidavit of Jane Okubo, appearing at pages 135-136 of Volume I of the circuit court record, reveals that Appellee Asada, after the fair hearing officer's decision, never filed a request with the social services unit for day care payments over $100 pursuant to § 5007.06, HPWM. Appellants contend that therefore the case should be dismissed because appellee did not exhaust her administrative remedies.

If, however, the appellees' complaint is construed as one for a judicial declaration that § 5007.06, HPWM, is an invalid agency rule, the action is expressly authorized under § 91-7, HRS. We will so construe it.

Appellees' position at oral argument was that § 5007.06, HPWM, allowed a payment in excess of $100 per month per child only if the recipient fell within the scope of the two exceptions set forth in paragraph (a)(1) of that section.

Appellants, on the other hand, contend that paragraph

(a)(2) allows approval of costs over a $100 for tuition or basic fee for child care if such payments can be shown to be reasonable. The deposition of Jane Okubo in the record reflects that administratively, appellants are adhering to their construction of the rule. That construction seems to us to be reasonable. We accept and adopt it since it conforms the application of HPWM § 5007.06 to the requirements previously quoted from *Shea, supra.*

We hold that the test for allowing child care payments is the reasonableness thereof. Where an appropriate child care facility is available to a recipient at a charge equal to or less than the standard of $100 per month per child, the burden is on the recipient to show that the expense of sending the child or children to a more expensive facility is reasonable in the circumstances.

We further hold that § 5007.06, HPWM, creates a procedure whereby a recipient can have the reasonableness of her excess payments determined. If such payments are held to be reasonable, either at the administrative level, or at a fair hearing pursuant to § 346-12, HRS, the social services unit would be required to make those payments under the regulation and the statute.

Appellees protest that many members of the class did not receive adequate notice so as to permit them to initiate the procedures set forth under § 5007.06, HPWM, but that is not in the record before us, nor is the issue of lack of adequate notice raised by the pleadings. Certainly Appellee Asada did receive adequate notice.

Accordingly, the judgment below is reversed and the case remanded for further proceedings consistent herewith.

*Robert K. Richardson,* Deputy Attorney General, for appellants.

*Brenton Rogozen* (Legal Aid Society of Hawaii) for appellees.

HAWAII PUBLIC EMPLOYMENT RELATIONS BOARD, Plaintiff-Appellee, *v.* UNITED PUBLIC WORKERS, LOCAL 646, AFSCME, AFL-CIO, et al., Defendants-Appellants

(NO. 7681)

HAWAII PUBLIC EMPLOYMENT RELATIONS BOARD, Plaintiff-Appellee, *v.* UNITED PUBLIC WORKERS, LOCAL 646, AFSCME, AFL-CIO, et al., Defendants-Appellants

(NO. 7916)

CIVIL NO. 2177

JUNE 24, 1983

LUM, PADGETT AND HAYASHI, JJ., AND CIRCUIT JUDGE SPENCER, IN PLACE OF NAKAMURA, J., DISQUALIFIED\*

---

\* Chief Justice Richardson, who heard oral argument in this case, retired from the court on December 30, 1982. HRS § 602-10 (1982 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

462

OPINION OF THE COURT BY HAYASHI, J.

These appeals are taken from the Fifth Circuit Court's grant of a temporary restraining order and a preliminary injunction and from its judgment fining defendant-appellant, the United Public Workers Union (UPW), $30,000 for contempt. The dispute which spawned the present litigation began on October 22, 1979, when all the Unit 1 public employees, represented by the UPW, went on strike, despite a prior decision by plaintiff-appellee, Hawaii Public Employees Relations Board (HPERB), requiring that certain positions designated as essential remain filled. This strike has since been settled and many of the statutory provisions which required interpretation have been amended by the legislature. However, during the course of the controversy, the UPW was adjudged in contempt and fined for violating a preliminary injunction issued at the behest of HPERB to compel compliance with HPERB's decision. It is the validity of the fine imposed which is at the heart of

the present appeals. We must, therefore, determine (1) whether the preliminary injunction, upon which the civil contempt is predicated, was properly granted; (2) whether the UPW was erroneously denied the right to a jury trial in the contempt proceedings; (3) whether fines were erroneously imposed retroactive from the filing of the contempt order; and (4) whether the termination of the strike prior to the calculation of the amount of the fine due necessitated a dismissal of the civil contempt proceedings. For reasons set forth below, we affirm.

I.

Hawaii's public employees are given the right to strike pursuant to HRS Chapter 89; the right can, however, be limited in situations where HPERB determines that a strike would pose an imminent or present danger to the health and safety of the public.

On September 19, 1979, the public employers of the State and four counties, cognizant of an impending UPW Unit 1 strike, petitioned HPERB to conduct an investigation pursuant to Hawaii Revised Statutes (HRS) § 89-12(c) (1976) to determine if a strike by state and county Unit 1 employees would endanger the public, and if so, to set requirements to protect the public from such danger.

During the investigatory hearings held from September 25 through October 16, 1979, the City and County of Honolulu filed a motion to adopt a plan setting requirements to be complied with to avoid any threat to the health and safety of the public.[1] A portion of the city's plan was the basis for what later became known as the special orders of Decision 119 issued by HPERB. The UPW objected to the City's motion stating, *inter alia,* that it was premature since the investigatory proceedings weren't completed.

Decision 119 required that certain essential positions remain filled to protect the public; the special orders put the onus on the UPW to implement the manning of the essential

---

[1] The Counties of Kauai and Maui also filed similar motions.

positions.[2] Despite Decision 119, the essential positions were left unfilled when the Unit 1 employees struck on October 22, 1979. Consequently, HPERB filed a complaint against the UPW and individual defendants requesting a permanent injunction and moving for a preliminary injunction and a temporary restraining order; on November 9, 1979, the court issued the preliminary injunction in question.

Subsequently, HPERB filed a motion for order to show cause and for a contempt judgment based on violations of the preliminary injunction. The UPW requested a jury trial; the request was denied. On November 19, 1979, the court found the UPW in contempt for not complying with provisions of the

---

[2] The special orders:

IT IS FURTHER ORDERED THAT:

Defendant UNITED PUBLIC WORKERS is restrained from continuing to violate the requirements imposed upon it by the following orders contained in Decision 119:

2. No later than 9 a.m., Saturday, October 20, 1979, the employers shall furnish to this Board and to the UNITED PUBLIC WORKERS a list of incumbents who are qualified to perform the subject services. From this list, the UNITED PUBLIC WORKERS shall select the number of employees required under the terms of this order to perform said services and no later than 3 p.m., Sunday, October 21, 1979, shall supply the employers with the names of the employees selected by the UNITED PUBLIC WORKERS to perform the required services.

3. The union shall be responsible for notifying and providing the necessary qualified employee, specified in its selection list, to work in compliance with this order.

8. The union shall be responsible for taking all necessary steps to insure that essential services required by this order are performed without interruption, slow-down, sick-out, or other form of interference.

9. The union shall provide the employer and the Board with a list containing the Unit 1 employees responsible for implementing this order at each worksite and for maintaining the required complement of employees on standby and as otherwise provided for by this order. These Unit 1 employees shall be responsible for maintaining contact with the employer and shall be available for contact at all times. This list shall be provided by 6 p.m., Sunday, October 21, 1979, and shall contain the addresses and telephone numbers of these employees.

10. The union shall provide the employer and the Board with a list of picket line captains at all picket lines maintained by Unit 1 employees. This list of picket line captains shall be furnished to the employer and the Board by 6 p.m., Sunday, October 21, 1979, and shall contain the addresses and telephone numbers of these individuals.

orders contained in the preliminary injunction and ordered that a fine be imposed of $5,000 a day from the date of the injunction — November 9, 1979 — for each working day that the preliminary injunction was not complied with. The UPW was given a grace period up until 2 p.m., Wednesday, November 21, 1979, within which to purge itself of contempt by effectuating the staffing of the essential-employee positions. The order adjudging the UPW in civil contempt was signed by the court on November 17, 1979, and filed on November 19, 1979. At the hearing on November 21, the court noted that substantial steps had been taken toward compliance but continued the original sanctions until full compliance was achieved.

Thereafter, on December 1, 1979, the UPW members ratified a contract proposal and resumed work on December 3, 1979.

On December 11, 1979, HPERB filed a motion for an order to confirm the amount of judgment and for an order directing payment of fines to the chief clerk. The UPW filed a motion to dismiss the complaint and/or dissolve the injunction on the grounds of mootness. Both motions were heard on January 4, 1980; the court denied the motion to dismiss. Subsequently, on March 4, 1980, the court filed its order confirming the amount of judgment.

The court entered a judgment fining the UPW $30,000 for non-compliance for November 14, 15, 16, 19, 20, and 21, on March 20, 1980.[3]

---

[3] Although the order adjudging the UPW in contempt imposed sanctions from the date of the issuance of the preliminary injunction, November 9, 1979, the preliminary injunction had given the UPW until midnight, November 13, 1979, to comply; therefore, the court held that fines were assessable only from November 14, 1979. The court found that there was substantial compliance after November 21, 1979; thus, it imposed fines for the days from the 14th through and including the 21st, excluding weekends and holidays.

## II.

We note at the outset that while "a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, that the plaintiff in the action [may not] profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued." *United States v. United Mine Workers of America,* 330 U.S. 258, 294-95, 67 S. Ct. 677, 696, 91 L. Ed. 884, 913 (1947); *United States v. Spectro Foods Corp.,* 544 F.2d 1175 (3rd Cir. 1976).[4] As discussed below, we deem the contempt to be civil in nature, thus, we must determine whether the injunction upon which it is predicated was properly issued.

Generally, the granting or denying of injunctive relief rests with the sound discretion of the trial court and the trial court's decision will be sustained absent a showing of a manifest abuse of discretion, *Miss Universe v. Flesher,* 605 F.2d 1130 (9th Cir. 1979); *Armstrong Education Ass'n. v. Armstrong School Dist.,* 5 Pa. Commw. Ct. 378, 291 A.2d 120 (1972). Abuse of discretion may be found where the trial court lacked jurisdiction to grant the relief, *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 52, 58 S. Ct. 459, 464, 82 L. Ed. 638, 645 (1938); *United States v. Corrick,* 298 U.S. 435, 56 S. Ct. 829, 80 L. Ed. 1263, *rehearing denied,* 298 U.S. 692, 56 S. Ct. 951, 80 L. Ed. 1409 (1936); *see Hawaii Public Relations Board v. Hawaii*

---

[4] *But see Latrobe Steel Co. v. United Steelworkers of America,* 545 F.2d 1336, 1348 (3rd Cir. 1976) (Garth, J., concurring) (suggests that *United Mine Workers* is only applicable to compensatory contempt orders; coercive contempt orders should not fall where injunction proved to be erroneously issued.); *Inland Steel Co. v. Local Union No. 1545, UMW,* 505 F.2d 293, 296-97 (7th Cir. 1974) *overruled on other grounds Zeigler Coal Co. v. Local Union No. 1870,* 566 F.2d 582, 585 (7th Cir. 1977); *Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook Railroad Co.,* 380 F.2d 570 (D.C. Cir.), *cert. denied,* 389 U.S. 970 (1967). The rationale of these cases is appealing and by applying *United Mine Workers* to a coercive contempt order we are not rejecting that rationale. Such analysis is not critical in this case because we find that the underlying injunction was properly issued.

*State Teachers Association,* 54 Haw. 531, 511 P.2d 1080 (1973), or where the trial court based its decision on an unsound proposition of law, *Societe Comptoir v. Alexander's Dept. Stores,* 299 F.2d 33, 35-36 (2nd Cir. 1962); *Town of Waterford v. Grabner,* 155 Conn. 431, 434-35, 232 A.2d 481, 482 (1967).

A.

In the instant case, the UPW attacks the issuance of the preliminary injunction claiming that the circuit court lacked jurisdiction to grant the injunctive relief it did. Although jurisdiction to hear and dispose of all actions under § 89-12 is conferred upon the circuit courts pursuant to HRS § 89-12(e),[5] the UPW contends the scope of the preliminary injunction — specifically the inclusion of the special order — was improper because HPERB lacked authority in the first instance to promulgate the orders and because the subject matter of the orders was never litigated before HPERB as required by Chapter 91. Consequently, it argues that the circuit court necessarily lacked jurisdiction to enforce them.

In determining whether HPERB had statutory authority to issue the special orders, we are directed to HRS § 89-12(c)[6] and 89-9(d) (1976); the former section provides:

---

[5] HRS § 89-12(e) states:

   If any employee organization or any employee is found to be violating or failing to comply with the requirements of this section or if there is reasonable cause to believe that an employee organization or an employee is violating or failing to comply with such requirements, the board shall institute appropriate proceedings in the circuit in which the violation occurs to enjoin the performance of any acts or practices forbidden by this section, or to require the employee organization or employees to comply with the requirements of this section. Jurisdiction to hear and dispose of all actions under this section is conferred upon each circuit court, and each court may issue, in compliance with Chapter 380, such orders and decrees, by way of injunction, mandatory injunction, or otherwise, as may be appropriate to enforce this section.

[6] HRS § 89-12(c) has since been amended by the legislature in 1980. As amended, it still affords HPERB broad powers in setting requirements; however, it stipulates that the "essential" employee has the burden of contacting the employer upon receiving notice of his "essential" status.

> Where the strike occurring, or is about to occur, endangers the public health or safety, the public employer concerned may petition [HPERB] to make an investigation. If the board finds that there is imminent or present danger to the health and safety of the public, the board shall set require-ments that must be complied with to avoid or remove any such imminent or present danger.

The UPW argues that the above section limits HPERB's power to merely setting minimum manning requirements.

We cannot agree with the UPW's restrictive interpretation. In construing statutory language, "[t]he fundamental objective . . . is to ascertain and give effect to the intention of the legislature. . . . The intention of the legislature is to be obtained primarily from the language contained in the statute itself." *In Re Hawaiian Telephone Co.,* 61 Haw. 572, 577, 608 P.2d 383, 387 (1980). Thus, the general rule is that "where the language of the law in question is plain and unambiguous, construction by this court is inappropriate and our duty is only to give effect to the law according to its plain and obvious meaning." *Id.* at 577-78, 608 P.2d at 387.[7]

In the instant case, the legislature authorized HPERB to "set requirements"; the power granted to HPERB was not qualified except that the requirements set had to be for public protection. The statutory language is plain and unambiguous; therefore, we may not, by imposition of qualifiers not implicit in the statutory language, limit the broad grant of power bestowed upon HPERB by the legislature. "Statutory con-struction permits the implication of words apparently intended for the purpose of upholding and giving force to the legislative will, but does not authorize the interpolation of conditions into a statute — additional terms — not found in the statute consid-

---

[7] This court has rejected the plain meaning rule where there is a wealth of "material evidencing legislative purpose and intent" to aid in statutory interpretation. *Black Construction Corp. v. Agsalud,* 64 Haw. 274, 283-84, 639 P.2d 1088, 1094 (1982). However, as to the interpretation of HRS § 89-12(c), resort to legislative history has proved unavailing.

ered as a whole." *In Re Application of Lightfoot,* 22 Haw. 293, 297 (1914).

The UPW argues, however, that other provisions of Chapter 89 — specifically § 89-9(d)[8] which provides that managerial functions are non-negotiable and are reserved for the public employer — implicitly restrict HPERB's authority in setting requirements under HRS § 89-12(c). It contends that the special orders are in contravention of HRS § 89-9(d) as they require "the [UPW to] direct employees, determine the personnel for the employer's operations, and otherwise be responsible for activities and conduct for the employer's carrying out of its mission." Opening Brief, p. 20.

We refuse to adopt the UPW's characterization of HRS § 89-9(d) as an overriding limitation, circumscribing the broad powers bestowed upon HPERB. Initially, we note that the language of the section relied upon by the UPW restricts the applicability of its provisions to *agreements* between employers and unions: "The *employer* and the *exclusive representative shall not agree* to any proposal which would . . . interfere with the rights of a public employer." HRS § 89-9(d)(7) (emphasis added). Decision 119 was not the result of an agreement between the employer and the union. Moreover, "[s]tatutory language must be read in the context of the entire statute and

---

[8] The pertinent provisions of HRS § 89-9(d) are as follows:

(d) Excluded from the subjects of negotiations are matters of classification and reclassification, the Hawaii public employees health fund, retirement benefits and the salary ranges and the number of incremental and longevity steps now provided by law, provided that the amount of wages to be paid in each range and step and the length of service necessary for the incremental and longevity steps shall be negotiable. . . . .

(7) . . . . The employer and the exclusive representative shall not agree to any proposal . . . which would interfere with the rights of a public employer to (1) direct employees; (2) determine qualification, standards for work, the nature and contents of examinations, hire, promote, transfer, assign, and retain employees in positions and suspend, demote, discharge or take other disciplinary action against employees for proper cause; (3) relieve an employee from duties because of lack of work or other legitimate reason; (4) maintain efficiency of government operations; (5) determine methods, means, and personnel by which the employer's operations are to be conducted; and take such actions as may be necessary to carry out the missions of the employer in cases of emergencies.

construed in a manner consistent with the purpose of the statute. *Pacific Ins. Co., Ltd. v. Oregon Automobile Ins. Co.,* 53 Haw. 208, 490 P.2d 899 (1973)." *State v. Kaneakua,* 61 Haw. 136, 140, 597 P.2d 590, 592 (1979). The other provisions of § 89-9 deal specifically with the negotiation process between employers and unions.[9]

The legislative history reveals that the intent of the legislature in enacting HRS § 89-9 was to allow the public employees and employers free range *in negotiating the terms of their contract* as long as those terms are consistent with the merit principle and the principle of equal pay for equal work and do not interfere with the rights of a public employer to carry out its public responsibility.[10] Nothing in the legislative history nor in the language of the statute itself compels the interpretation suggested by the UPW. Furthermore, this court has recently stated, "Judicial deference to agency expertise has . . . been a guiding precept where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are the subject of review." *Aio v. Hamada,* 66 Haw. 401, 406, 664 P.2d 727, 731 (1983). Thus, "'courts award persuasive weight to administrative construction and follow

---

[9] HRS § 89-9 *Scope of negotiations.* (a) The employer and the exclusive representative shall meet at reasonable times, including meetings in advance of the employer's budget-making process, and shall negotiate in good faith with respect to wages, hours, and other terms and conditions of employment which are subject to negotiations under this chapter and which are to be embodied in a written agreement, or any question arising thereunder, but such obligation does not compel either party to agree to a proposal or make a concession.

(b) The employer or the exclusive representative desiring to initiate negotiations shall notify the other in writing, setting forth the time and place of the meeting desired and generally the nature of the business to be discussed, and shall mail the notice by certified mail to the last known address of the other party sufficiently in advance of the meeting.

(c) Except as otherwise provided herein, all matters affecting employee relations, including those that are, or may be, the subject of a regulation promulgated by the employer or any personnel director, are subject to consultation with the exclusive representatives of the employees concerned. The employer shall make every reasonable effort to consult with the exclusive representatives prior to effecting changes in any major policy affecting employee relations.

[10] Sen. Stand. Comm. Rep. No. 745-70, in 1970 Senate Journal at 1330.

the same, unless the construction is palpably erroneous.'" *Treloar v. Swinerton & Walberg Co.,* 65 Haw. 415, 423, 653 P.2d 420, 426 (1982); *Waikiki Resort Hotel v. City and County,* 63 Haw. 222, 242-43, 624 P.2d 1353, 1368 (1981). We, therefore, conclude that HPERB had the authority to set the requirements embodied in the special orders, which brings us to the question of whether HPERB exercised this power in a manner consistent with the Hawaii Administrative Procedures Act (HAPA), HRS Chapter 91.

Chapter 91 provides, *inter alia,* that parties be afforded an opportunity for hearing after reasonable notice (HRS § 91-9(a)) and for cross-examination and rebutting evidence (HRS § 91-10(3)). Additionally, HRS § 91-12 and paragraph three of HRS § 89-5 require that all decisions of the Board be reduced to writing and accompanied by findings of fact. Utilizing these sections, the UPW argues it was not afforded adequate notice and the opportunity to litigate the specifics of the special orders as evidenced by the fact that there were no specific findings of fact or conclusions of law incorporated in Decision 119 concerning the subject matter of the special orders. Thus, it contends, the issuance of the special orders violated HAPA. We disagree.

In reviewing the requirements of HRS § 91-12 with respect to the sufficiency of administrative orders, this court has stated that:

> Findings of fact, to be sufficient to support an order, must include . . . the basic facts, from which the ultimate facts in terms of the statutory criterion are inferred. It is not necessary for the Commission to recite the evidence, and it is not necessary that it set out its findings in the formal style and manner customary in trial courts. It is enough if the findings be unambiguously stated, whether in narrative or numbered form, so that it appears definitely upon what basic facts the Commission reached the ultimate facts and came to its decision.

*In Re Kauai Electric Division of Citizens Utility Co.,* 60 Haw. 166, 184, 590 P.2d 524, 537 (1978), quoting *Saginaw Broadcasting Co. v. Federal Communications Commission,* 96 F.2d 554, 560 (D.C. Cir. 1938).

In the instant case, HPERB found that the UPW was the

exclusive representative of the Unit 1 employees which included the essential employees. It further found that negotiations for a new contract had commenced on October 18, 1978. The parties had come to an impasse on June 22, 1979. A mediator had been appointed to assist the parties, however, mediation had failed. On October 10, 1979, the UPW State Director had written to HPERB advising it that if a satisfactory agreement was not reached on or before October 22, 1979, a strike would ensue.

The facts show that there existed a breakdown in the employer-employee relationship. Consequently, HPERB, acutely aware of the volatile situation presented by the impending strike, concluded that "the UPW's suggestion that private contractors or *scabs* or persons in wholly unrelated classifications should perform the work [was] frivolous, unrealistic, and wholly divorced from the realities of the tensions and pressures which exist in a strike." (Decision 119 at 23, emphasis added.) Such findings and conclusions are sufficient to support HPERB's decision to require the UPW, the party with the most sway over its members given the realities of a strike, to implement the minimum manning requirements.

### B.

Additionally, the UPW contends that the preliminary injunction was erroneously issued based on the circuit court's misapplication of the law — specifically the circuit court's adoption of a "mass-action" theory.

The "mass-action" theory is a theory of vicarious liability employed to hold unions responsible for the concerted acts of their members. It was first articulated in *United States v. International Union, UMWA,* 77 F. Supp. 563 (D.C. 1948), in response to the union's attempt to avoid liability for a wildcat strike involving 450,000 by disavowing any union authorization of or participation in the strike. Although the court found that the union utilized a "code" to trigger the walk out, the court refused to become embroiled in an evaluation of whether the "code" provided a sufficient causal connection and relied on a vicarious liability theory — mass-action theory — instead

of actual proof of union instigation. *Id.* Fishman & Brown, *Union Responsibility for Wildcat Strikes,* 21 Wayne L. Rev. 1017, 1025-26 (1975). The premise underlying the theory is that large groups of people do not act spontaneously and collectively without leadership. 77 F. Supp. at 566; 89 Harv. L. Rev. 601, 604 (1976); 50 Miss. L. J. 941 (1979).

Since its genesis, the "mass-action" theory has been adopted in numerous cases. *Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951 (3d Cir. 1975); *Wagner Electric Corp. v. Local 1104, International Union of Electrical Radio & Machine Workers,* 496 F.2d 954, 956 (8th Cir. 1974); *Vulcan Material Co. v. United Steelworkers,* 430 F.2d 446, 455 (5th Cir. 1970), *cert. denied,* 401 U.S. 963 91 S. Ct. 974, 28 L. Ed. 2d 247 (1971). *Contra Peabody Coal Co. v. Local Unions 1734, 1508, 1548, and District No. 23, UMWA,* 543 F.2d 10, 12, *cert. denied,* 430 U.S. 940, 97 S. Ct. 1571, 51 L. Ed. 2d 787 (6th Cir. 1976). However, its applicability in holding an international or district union legally responsible for the illegal actions of its locals has been implicitly repudiated by the United States Supreme Court. *Carbon Fuel Co. v. United Mine Workers of America,* 444 U.S. 212, 100 S. Ct. 410, 62 L. Ed. 2d 394 (1979). The Court, while not specifically mentioning the mass-action theory, held that proof of agency was required before an international or district union could be held liable for the acts of their locals.

The UPW questions the continued viability of the mass-action theory in light of *Carbon Fuel,* and contends that HRS § 380-6, which requires proof of agency before a union may be held liable for the unlawful acts of individual officers, members, or agents, explicitly bars the application of a vicarious liability theory in this state. Conversely, HPERB contends *Carbon Fuel* is not instructive where the liability of a local union is at issue, HRS § 380-6 does not affect the viability of the mass-action theory which is separate and distinct from an agency theory, and HRS § 380-6 has no application in cases arising under HRS § 89-12.

The circuit court, apparently swayed by HPERB's arguments, accepted the mass-action theory, finding "as a matter of law, that the action of the individual employees are concerted or mass action for which they and the defendant United Public

Workers can be held responsible." Preliminary Injunction. However, even if we assume that the circuit court erroneously adopted the mass-action theory, such assumption would not require a reversal of the circuit court because the injunction was issued against the UPW based on evidence of the UPW's own failure to comply with the specifics of Decision 119.

Decision 119 required the UPW to furnish the employers with lists containing the names of Unit 1 employees responsible for implementing the requirements of said decision, to provide the employers with a list of picket captains at all picket lines maintained by Unit 1 employees, and to be responsible for taking all necessary steps to insure that essential services required by the decision be performed without interruption. The circuit court found that the UPW, *itself,* failed to comply with the above-stated requirements of Decision 119.

Although the testimony adduced at the hearing on the motion for the preliminary injunction focused on the fact that individuals were not reporting to fill the essential positions, such evidence demonstrated that the UPW had failed to take all necessary steps to insure that the essential services were being performed as required by Decision 119. The UPW did not then, nor does it now, suggest that its efforts to comply with Decision 119 were thwarted by its members' refusal to respond to such efforts. On the contrary, at the hearing on the motion for the preliminary injunction, the UPW presented no evidence of its efforts to comply with Decision 119. Furthermore, the UPW's Kauai Division Director, Gary Rodrigues, testified that the incumbents of the essential positions were informed that compliance with Decision 119 was "a matter of individual conscience." 11/7/79 Tr. at 57. In light of such evidence, and lack thereof, it was proper for the circuit court to issue injunctive orders against the UPW as a result of its failure to comply with Decision 119.[11]

---

[11] The UPW also argues that there was insufficient evidence to find it in contempt. It contends that the adoption of the mass-action theory enabled the court to find it in contempt without concrete evidence that the UPW itself was preventing, obstructing,

III.

Even if the preliminary injunction is valid, the UPW contends that it was denied due process in the contempt proceedings where the lower court denied its request for a jury trial. The UPW argues that a jury trial is required under HRS §§ 89-12(e) and 380-11; under the Sixth Amendment when fines of great magnitude are imposed; and under HRS § 710-1077 (1976) since the imposition of fines retrospectively converted the contempt action into a criminal proceeding.

As we will discuss below, the contempt proceeding was civil in nature, thus, HRS § 710-1077 does not impose a jury requirement.[12] Additionally, the UPW's argument that a jury

---

discouraging, or coercing any essential employees from returning to work. This argument is without merit.

At the contempt hearing on November 16, 1979, Gary Rodrigues, the UPW Kauai Division Director, testified that the UPW did not encourage its members to return to work as required by the preliminary injunction, it failed to provide the employers with various lists as required, and it failed to take steps to implement the minimum manning requirements as required, except to mail copies of the preliminary injunction to its members and inform them that the UPW would take no reprisals against employees who decided to return to work. The preliminary injunction placed an affirmative duty upon the UPW to make good faith efforts to get their members to return to work. It is clear from the evidence that the UPW failed to comport with the specifics of said injunction and the court properly found it in contempt.

[12] HRS § 710-1077, enacted in 1972 as part of the Hawaii Penal Code, provides for jury trials in *criminal* contempt cases except where the contempt may be treated as a petty misdemeanor. This statutory provision is in conformity with a series of United States Supreme Court opinions adopting the position that the constitution's jury trial provisions apply where the criminal contempt constitutes a serious offense, *Dyke v. Taylor Implement Mfg. Co.,* 391 U.S. 216, 88 S. Ct. 1472, 20 L. Ed. 2d 538 (1968); *Bloom v. Illinois,* 391 U.S. 194, 198, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968); *Cheff v. Schnackenburg,* 384 U.S. 373, 86 S. Ct. 1523, 16 L. Ed. 2d 629 (1966); *United States v. Barnett,* 376 U.S. 681, 692, 84 S. Ct. 984, 990, 12 L. Ed. 2d 23, 31, *rehearing denied,* 377 U.S. 973, 84 S. Ct. 1642, 12 L. Ed. 2d 742 (1964), and in conformity with prior Hawaii law limiting the punishment which may be imposed if the court proceeds summarily without a jury. HRS § 729-1(1)(2)(3).

The provisions of HRS § 710-1077 are explicitly limited to criminal contempt cases and, thus, do not afford the UPW the right to a jury trial in a civil contempt action. HRS § 710-1077(6). ("Nothing in this section shall be construed to alter the court's power to punish civil contempt.") *Cf. Murray v. Murray,* 60 Haw. 160, 165, 587 P.2d 1220, 1224 (1978). (Where the court determined on appeal that the sanction imposed was punitive in design or effect, the proceedings would have to meet the stricter procedural standards of criminal contempt. Conversely, if the sanctions imposed were valid civil sanctions, the stricter procedural standards would not have been applicable.)

trial was required under the Sixth Amendment where fines of sufficient magnitude are imposed is without merit. The existence of such a right turns upon whether the contempt proceeding was criminal or civil in nature. If civil, then there is no jury right under the Sixth Amendment, *Shillitani v. United States,* 384 U.S. 364, 365, 86 S. Ct. 1531, 1533, 16 L. Ed. 2d 622, 624, (1966); only if the proceeding is criminal is the right to a jury dependent upon the magnitude of the penalty imposed. *Muniz v. Hoffman,* 422 U.S. 454, 475-77, 95 S. Ct. 2178, 2190-91, 45 L. Ed. 2d 319, 334-35 (1975); *Bloom v. Illinois,* 391 U.S. 194, 207-08, 88 S. Ct. 1477, 1485-86, 20 L. Ed. 2d 522, 531-33 (1968); *Cheff v. Schnackenberg,* 384 U.S. 373, 378-80, 86 S. Ct. 1523, 1525-26, 16 L. Ed. 2d 629, 632-634, (1966). Thus, our inquiry is limited to the UPW's first contention.

As we stated earlier, HRS § 89-12(e)[13] grants the circuit courts jurisdiction to hear and dispose of all actions under § 89-12, " in compliance with chapter 380." HRS § 89-12(e). This court, previously interpreting this section, has concluded that the phrase " 'in compliance with chapter 380' can properly be construed only in conjunction with the latter phrase 'as may be appropriate to enforce this section.' " *Hawaii Public Employment Relations Board v. Hawaii State Teachers Association,* 54 Haw. 531, 536, 511 P.2d 1080, 1083 (1973). Thus, where provisions of Chapter 380 would contradict those of Chapter 89 or would vitiate the vitality of the enforcement phase of the collective bargaining law, such provisions would be deemed inapplicable. *Id.*

The specific provision of Chapter 380 — HRS § 380-11[14] —

---

[13] *See* note 4. HRS § 89-12(e) has been amended by the legislature. It now explicitly provides that there is no right to a jury trial in any proceeding brought under this section.

[14] HRS § 380-11 *Contempt; speedy and public trial.* In all cases arising under this chapter in which a person is charged with contempt in a court of the State, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the circuit wherein the contempt has been committed; provided, that this right shall not apply to contempts committed in the presence of the court or so near thereto as to interfere directly with the administration of justice or to apply to the misbehavior, misconduct, or disobedience of any officer of the court in respect to the writs, orders, or process of the court.

relied upon by the UPW affords all persons charged with contempt in cases arising under Chapter 380 the right to a jury trial. The UPW argues that HRS § 380-11 is not contradictory to provisions in Chapter 89 and, thus, applicable in the instant case. We do not agree. The legislature entrusted HPERB with the responsibility of protecting the public's health and safety in situations where a public employees' strike would pose a threat. It further granted HPERB judicial recourse in pursuance of such objective and granted the circuit courts the power to enforce HPERB's decisions. Were we to rule that the parties who violate injunctive orders issued by the court at HPERB's request are entitled to a jury trial in contempt proceedings, we would impair the vitality of the enforcement phase of the collective bargaining law. The policy behind HRS § 89-12(e) is to protect the public, and implicit in the protection of the public is the need for speedy resolution of any threat to public health and safety. If the protective orders could not be enforced without resort to a jury trial, which necessarily would be lengthier than a bench trial,[15] the legislative policy would be impaired. Thus, the lower court properly denied the UPW's request for a jury trial.

IV.

The UPW's argument that it was entitled to all the procedural safeguards afforded a criminal contemnor is based on its belief that the imposition of fines retroactive from the filing of the contempt order transformed the contempt action from civil[16] to criminal. In the alternative, it argues that the sanc-

---

[15] *Rankin v. Shanker,* 23 N.Y.2d 111, 242 N.E.2d 802, 295 N.Y.S.2d 625 (Ct. App. 1968).

[16] The circuit court called the proceeding one for civil contempt, however, denomination as such is not determinative. *Shillitani v. United States,* 384 U.S. at 369 (The court concluded that the contempt was civil in nature noting that, "[t]he fact that both the District Court and the Court of Appeals called petitioners' conduct 'criminal contempt' does not disturb our conclusion."); *Latrobe Steel Co. v. United Steelworkers, AFL-CIO,* 545 F.2d 1336, 1342 (3d Cir. 1976) ("[T]he cases admonish us to ascertain independently the nature of the decree instead of treating the district court's mere characterization or label as dispositive.").

tions imposed — retroactive fines — were improper in a civil contempt action and should be vacated.

The demarcation between civil and criminal contempt is not always clear; however, each has its distinguishing characteristics. "Sentences or fines for criminal contempt are punitive in nature. . . . Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reasons of noncompliance and may be imposed for prohibited acts irrespective of intent." *Hawaii Public Employees Relations Board v. Hawaii State Teachers Association,* 55 Haw. 386, 392, 520 P.2d 422, 426-27 (1974). In explaining the difference, the United States Supreme Court stated, "'It is not the fact of punishment but rather its character and purpose that often serve to distinguish civil from criminal contempt. . . . The test may be stated as: what does the court primarily seek to accomplish by imposing sentence?" *Shillitani v. United States,* 384 U.S. 364, 369-70, 86 S. Ct. 1531, 1535, 16 L. Ed. 2d 622, 626-627 (1966), quoting from *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S. Ct. 492, 498, 55 L. Ed. 797, 806 (1911). *See United States v. Mine Workers,* 330 U.S. 258, 302-04, 67 S. Ct. 677, 700-01, 91 L. Ed. 884, 917-18 (1947); *McTigue v. New London Education Association,* 164 Conn. 348, 321 A.2d 462 (1973). The court's intent may be gleaned from the form of the sanctions imposed; "[t]he significant and essential characteristic of a sanction imposed for civil contempt is that the penalty can be *avoided* by compliance with the court order." *Murray v. Murray,* 60 Haw. 160, 162, 587 P.2d 1220, 1222 (1978) (emphasis added); *Hawaii Public Relations Board v. Hawaii State Teachers Ass'n.,* 55 Haw. at 392-93, 520 P.2d at 427. *See Doyle v. London Guarantee & Accident Co.,* 204 U.S. 599, 27 S. Ct. 313, 51 L. Ed. 641 (1907) (An action is civil when a contemnor can obtain a release from a sentence by compliance with a judicial decree.); *Baker v. Eisenstadt,* 456 F.2d 382, *cert. denied,* 409 U.S. 846 (1st Cir. 1972); *School District of Pittsburgh v. Pittsburgh Federation,* 31 Pa. Commw. 461, 468, 376 A.2d 1021, 1025 (Pa. 1977) ("It is clear that appellants could have complied with the injunction of January 8, 1976, *after* the lower court had determined that they were guilty of

contempt, and not incurred any penalties at all. We will, therefore, affirm the lower court's conclusion that the appellants were guilty of civil contempt."); *School Committee v. Pawtucket Teachers Alliance,* 101 R.I. 243, 256, 221 A.2d 806, 814 (1966); *Voluntary Hospitals v. Local 1199,* 86 LRRM 2375 (S.D.N.Y. 1974) (fines to be suspended if picket lines withdrawn and union employees returned to work by specified time — civil contempt).

The fines in the instant case fall within the realm of appropriate sanctions for civil contempt; each day of non-compliance with the terms of the preliminary injunction would cost the UPW $5,000, thus, the fines were imposed to coerce the UPW into compliance with the preliminary injunction. Although the fines, imposed on November 19, 1979, were made retroactive to the date of the issuance of the preliminary injunction, November 9, 1979, they were suspended *in toto* until 2 p.m. on November 21, 1979, at which time the court would review the matter and "[would] take at that time such appropriate action as may be necessary to impose the fine hereinabove mentioned for *non-compliance, or remit and vacate* said fines." (Order adjudicating defendant UPW in civil contempt and imposing fines) (emphasis added). The order specifies that fines would be imposed only for non-compliance with the preliminary injunction; thus, the fines imposed were proper in a civil contempt action.[17]

---

[17] The UPW implies that the calculation of the amount of fines due after the termination of the strike effectively transformed the proceedings into one for criminal contempt. This argument is without merit.

As we recognized in [*Hawaii Public Employment Relations Board v. Hawaii State Teachers Association,* 55 Haw. 386, 520 P.2d 422 (1974)], the penalty may be fixed in the court order which creates defendant's obligation, as well as in a subsequent coercive order. Where an injunctive order provided that a fine in a fixed amount would be imposed in the event of a violation, the subsequent imposition of the fine was for a civil contempt although the defendant was not able to avoid the penalty by rectifying the past noncompliance.

*Murray v. Murray,* 60 Haw. 160, 162 n. 3, 587 P.2d 1220, 1222 n. 3 (1978). "Certainly, the characteristic of a coercive civil contempt action is not abandoned when, although both the adjudication of contempt and imposition of the fine are coercively prospective, the final assessment of such coercively imposed fines does not occur prior to the termination of the contemptuous act." *Brotherhood of Local Firemen & Enginemen v. Bangor & Aroostook Ry.,* 380 F.2d 570, 578-79 (D.C. Cir.), *cert. denied,* 389 U.S. 970 (1967).

V.

Finally, the UPW argues that the ratification of the new contract on December 1, 1979, and the return of the UPW Unit 1 employees to work on December 3, 1979, mooted the main action, and, thus, the circuit court erred in refusing to dismiss the complaint and dissolve the injunctive orders and erred in subsequently proceeding to calculate the amount owed by the UPW for its previous violation of the injunctive orders. It relies on *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 31 S. Ct. 492, 55 L. Ed. 797 (1911) and its progeny for the proposition that where the main action is terminated, i.e., by mootness, civil contempt proceedings predicated upon it are abated. We do not believe that the cases cited by the UPW are determinative.

In *Gompers,* the court determined that the fixed prison sentences imposed were improper where defendants were subjected to civil contempt proceedings and, thus, not afforded procedural safeguards due a defendant in a quasi-criminal or penal proceeding. However, it refused to proceed further in the contempt appeal because it was apparent from statements of counsel in a previous appeal of the original case in which the injunction was issued, that there had been a complete settlement of all matters involved in the case. 221 U.S. 451, 31 S. Ct. 502, 55 L. Ed. 810. The court stated:

[T]his was a proceeding in equity for civil contempt where the only remedial relief possible was a fine payable to the complainant. The company prayed "for such relief as the nature of its case may require," and when the main cause was terminated by a settlement of all differences between the parties, the complainant did not require, and was not entitled to, any compensation or relief of any other character. The present proceeding necessarily ended with the settlement of the main cause of which it is a part.

*Id.* at 451-52. *Gompers* thus holds that a civil contempt proceeding abates where the parties enter into an out-of-court settlement which completely resolves all matters involved in the litigation between them. *Trans International Airlines, Inc. v. International Brotherhood of Teamsters,* 650 F.2d 949, 956

(9th Cir. 1980).

The instant case does not involve a settlement of the main controversy, thus, the specific holding in *Gompers* is not applicable. However, the ruling in *Gompers* has since been interpreted to encompass many situations where there is a termination of the main action whether such termination resulted from a settlement, *General Electric Co. v. Seltzer,* 161 F. Supp. 200, 203 (D. Del. 1958); *Kerl v. Hofer,* 4 Wash. App. 559, 562, 482 P.2d 806, 810 (1971), a trial on the merits resulting in a ruling adverse to the complainant, *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336, 1345-48 (3rd Cir. 1976); *United States v. United Mine Workers,* 330 U.S. 258, 294-95, 67 S. Ct. 677, 696-97, 91 L. Ed. 884, 913 (1947), or a change in circumstances which renders the controversy between the parties moot, *Pacific Gamble Robinson Co. v. Minneapolis & St. L. Ry.,* 92 F. Supp. 352, 355 (D. Minn. 1950); *New Jersey Zinc Co. v. Local 890,* 57 N.M. 617, 261 P.2d 648 (1953); *State v. King,* 82 Wis. 2d 124, 262 N.W.2d 80 (1978).

The rationale for ruling that civil contempt proceedings abate when the main cause is terminated turns upon the purpose of civil contempt proceedings which is to provide a remedy for one of the parties. *Shillitani v. United States,* 384 U.S. 364, 368, 86 S. Ct. 1531, 1534, 16 L. Ed. 2d 622, 626 (1966). Thus, if the complaining party becomes disentitled to further benefits of such order, as is the case when the proceedings out of which the order arose are terminated, the civil contempt proceedings must necessarily be terminated. *In re Grand Jury Proceedings,* 574 F.2d 445, 447 (8th Cir. 1978); *Harris v. Texas & Pacific Ry.,* 196 F.2d 88, 90 (7th Cir. 1952).

The UPW argues that the settlement of the strike mooted the main case constituting a termination of the same and requiring a dismissal of the complaint and the contempt action; it relies on *Pacific Gamble Robinson Co.* in its brief and it vigorously asserted the applicability of *State v. King* for the same proposition before the circuit court. However, neither is on point.

In *Pacific Gamble Robinson Co.,* the plaintiff obtained a temporary mandatory injunction requiring the defendant to furnish railroad refrigeration cars to plaintiff's company. Defendant appealed from that order and the court of appeals

dismissed the appeal on the ground that the question presented on appeal — the propriety of the temporary mandatory injunction — was moot because defendant had since begun to furnish the refrigeration cars to plaintiff. By that time, plaintiff's employees had ended their strike which defendant contended had prevented service to plaintiff. Thereafter, the trial court dismissed the main action and the civil contempt proceedings which had been continued in the trial court *pending* the decision of the court of appeals, reasoning that the termination of the controversy divested the court of any equitable grounds to proceed. "There [was then] no need for any proceeding in the civil contempt to assess damages for plaintiff's benefit in order to coerce defendant to comply with the Court's order." 92 F. Supp. at 354.

Similarly, in *State v. King,* the Wisconsin Supreme Court dismissed civil contempt proceedings against the state employees' union for violating an anti-strike injunction where the strike had terminated prior to the institution of the contempt proceedings. The court stated that under the *Gompers* rule, "civil contempt begun before or, as here, after the settlement of the underlying dispute, is moot because it cannot achieve a coercive or remedial effect." 82 Wis. 2d. at 132, 262 N.W.2d at 84.

The two cases are readily distinguishable from the case before us. In both *Pacific Gamble Robinson Co.* and *State v. King,* the disputes between the parties had terminated prior to any action by the respective courts on the contempt proceedings; thus, the need for any type of coercive sanction, a principal objective of any civil contempt action, was obviated and the complainants were not entitled to benefit from any civil contempt orders. In contrast, the UPW was adjudged in contempt prior to the termination of the strike which spawned the litigation. The sanctions when imposed were coercive in purpose and in effect as seen by the UPW's subsequent attempts to comply with the injunctive orders; HPERB was entitled to the benefits of such orders at that time. Admittedly, once the strike was settled, HPERB was no longer entitled to any further benefits from the contempt orders; it did not reap any. The only thing required to be done after the settlement of the strike

was for the circuit court to determine the amount of fines owed by the UPW. We are unconvinced that the settlement of the strike prior to the court's calculation of the fines owed requires this court to vacate the fines imposed. A contrary ruling could effectively defeat the coercive function of civil contempt sanctions. A party would be able to ignore injunctive orders, be adjudged in civil contempt, and still avoid paying any fines by the fortuitous settlement of the dispute prior to the court's calculation of the fines due.

Affirmed.

*James A. King* (*King & Nakamura,* a Law Corporation) for appellant.

*Valri Lei Kunimoto* (*Linda K. Goto* on the brief, Hawaii Public Employment Relations Board) for appellee.