38 P.3d 570

Darryl S. IGAWA, Respondent–
Claimant–Appellant,

v.

KOA HOUSE RESTAURANT, Petitioner–
Employer–Appellee,

and

Pacific Insurance Company, Petitioner–
Insurance Carrier–Appellee.

No. 22464.

Supreme Court of Hawai'i.

Aug. 30, 2001.

Edie A. Feldman, on the briefs, for petitioner-employer-appellee.

Danny J. Vasconcellos, Honolulu, of Takahashi, Masui & Vasconcellos, on the briefs, for respondent-claimant-appellant.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ. and ACOBA, J., concurring in part and dissenting in part.

Opinion of the court by NAKAYAMA, J.

Petitioner-employer-appellee Koa House Restaurant (Koa House) and petitioner-insurance carrier-appellee Pacific Insurance Company (collectively, Employer) apply to this court for a writ of certiorari to review the memorandum opinion of the Intermediate Court of Appeals (ICA) in *Igawa v. Koa House Restaurant,* 95 Hawai'i 438, 23 P.3d 773 (App.2001) [hereinafter, the "ICA's opinion"], reversing in part and affirming in part the decision and order of the Labor and Industrial Relations Appeal Board (LIRAB or the Board). Employer argues that the ICA gravely erred by: 1) applying the HRS § 386–85(1) (1993) presumption of compensability to the determination of permanent partial disability (PPD) benefits and disfigurement benefits; 2) rejecting Employer's experts' opinions that respondent-claimant-appellant, Darryl Igawa (Claimant) had no work-related permanent impairment; and 3) overruling several of the Board's findings of fact that were not at issue on appeal. We hold that Employer adduced substantial evidence so as to rebut the presumption of compensability and that the Board's findings that Claimant did not suffer any permanent

physical or psychological impairment as a result of a work-related incident were not clearly erroneous. Therefore, we reverse part III.A. of the ICA's opinion and affirm the Board's denial of PPD benefits to Claimant.

## I. BACKGROUND

On October 3, 1991, Claimant was employed as a cook for Koa House. As Claimant was reaching for another pot, a "big soup pot" fell approximately two feet and hit him above his right eyebrow. The blow also caused his neck to jerk back. Claimant felt dazed, but did not lose consciousness. In the years following the injury, Claimant saw numerous physicians for the treatment of the symptoms that he subsequently developed and for evaluations in the course of his workers' compensation claim.

On November 3, 1993, Yoshio Hosobuchi, M.D., reported that Claimant was suffering from paroxysmal headaches and seizures and that his magnetic resonance imaging test indicated that he had a cyst on his right frontal lobe. Dr. Hosobuchi's impression was that the cyst "probably formed post traumatically secondary to pre-existing cavernous angioma." Dr. Hosobuchi recommended that the cyst be surgically removed. Because Employer did not authorize the surgery, Claimant requested a hearing before the LIRAB Disability Compensation Division. The hearing was scheduled for September 4, 1994.

On October 31, 1994, the Director of the Disability Compensation Division (the Director) rendered a written decision. In the findings of fact, the Director noted that Maurice Nicholson, M.D., opined that the original cause of the cyst was an injury that occurred in 1975.[1] The Director noted that there was conflicting medical testimony as to whether Claimant's condition was attributable to the work injury or to the 1975 injury. The Director stated:

> Upon review of the entire matter, it is determined that the surgical excision of the lesion from the right frontal lobe appears to be reasonable and necessary med-

---

1. In August 1975, Claimant fell 15 feet into a drainage ditch and hit his head. He was knocked unconscious, and remained in a coma for approximately six days.

ical care which relates to said [work] injury.

We credit Dr. Hosobuchi's reports . . . in which he opines that claimant "had a small cavernous angioma in the right frontal lobe and because of the head injury it may have hemorrhaged causing headache and seizure problems." Further, Dr. Hosobuchi opines that surgery would eliminate claimant's headache's and seizures.

The Director found that: there was insufficient medical evidence to rebut Dr. Hosobuchi's opinions; the medical evidence indicated that Claimant's headaches and seizures began after the work injury; and, although Claimant had suffered headaches related to the 1975 injury, the condition had been resolved prior to the work injury.

The Director ordered Employer to pay for medical care, services, and supplies necessary to treat Claimant's injury, including the surgery recommended by Dr. Hosobuchi. The Director also awarded Claimant temporary total disability (TTD) benefits, but stated that permanent disability and disfigurement benefits, if any, would be determined at a later date. The Director issued an amended decision on November 15, 1994 that clarified that Claimant's TTD benefits were to be paid until the Director determined that the disability had ended. None of the parties appealed this decision.

A hearing to address the issues of permanent disability, disfigurement, temporary total disability, and other issues was scheduled for March 13, 1996. The Director issued a supplemental decision on July 12, 1996 stating that Claimant was entitled to: 1) 183 4/7 weeks of TTD benefits at $193.34/week for a total of $35,491.69; 2) 232.7009 weeks, which represented a thirty-five percent disability of the whole person, of PPD benefits at $193.34/week for a total of $44,990.40; and 3) a disfigurement benefit of $2,000 for his eight-and-a-half inch surgical scar. Employer appealed the decision to the Board.

On September 13, 1996, the Board issued a pretrial order stating that the issues to be determined were:

a. What is the extent of permanent disability resulting from the work injury of October 3, 1991.

b. What is the extent of disfigurement resulting from the work injury of October 3, 1991.

The trial was held on September 29, 1997. Employer presented no witnesses and rested on its brief.

Claimant testified that he was currently taking medication for seizures, headaches, a sleeping disorder, and chronic pain and that his doctors had informed him that he would have to remain on the medication for the rest of his life. In addition, Claimant testified that he suffered depressive episodes, decreased socialization, dizziness, blurred vision, clumsiness, fatigue, loss of concentration, decreased appetite, and memory problems. He also testified that the surgery to remove the cyst did not eliminate his blackouts; the most recent episode had occurred a month before the hearing. Claimant also experienced periods of suicidal tendencies.

Claimant testified that he suffered seizures and hallucinations as a result of his fall in 1975 and was treated for his condition for seven to eight years after the fall. After that time, his seizures and blackouts ceased, he was able to be more physically active, and he was "getting off" his medication. According to Claimant, in the months prior to his work injury, he was off medication and "[e]verything was fine." Claimant testified that he has been unable to find a job since the accident because of his condition and because he could not stand or sit for long periods of time and could not drive a car or operate heavy machinery.

On cross-examination, Claimant testified that, after the accident, he had continued to work for Koa House until April 1992. According to Claimant, he was fired because he "couldn't come to work" because of his medical problems. However, he admitted that there were complaints about him playing music too loudly as well as other problems with his co-workers. Claimant testified that he had problems with his co-workers before the accident, but that they had worsened after the accident. On November 21, 1997, Claimant submitted his proposed findings of fact and conclusions of law, and Employer submitted its position statement.

The Board filed its decision and order on March 30, 1999. The Board found that Claimant suffered only a "minor head trauma" due to the work accident and that, based on the opinion of Juris Bergmanis, M.D., a neurosurgeon, Claimant's cyst "was more probably related to his major head injury in 1975." The Board also found, based on the report of George Bussey, M.D., a psychiatrist, that Claimant did not have any permanent psychological impairment as a result of his work injury. The Board ultimately concluded that "Claimant did not sustain any permanent disability attributable to his October 3, 1991 work injury, because Claimant's work injury was a minor head trauma which would not have resulted in any permanent impairment either on a physical or psychiatric basis." The Board also reduced Claimant's disfigurement benefit to $850.00. Claimant timely appealed.

On appeal, Claimant argued that: 1) the Board erred in concluding that he had not sustained any permanent disability as a result of his work injury; 2) the Board's finding that he had only suffered a minor head trauma was clearly erroneous; 3) the Board erred by refusing to consider the expert medical opinions he had adduced concerning the degree of impairment he suffered; and 4) the Board erred in reducing the disfigurement benefit. In a memorandum opinion dated February 2, 2001, the ICA affirmed the Board's decision and order in part and reversed it in part.

The ICA noted that, under HRS § 386–85(1), Employer had the burden of rebutting the presumption that Claimant had suffered PPD as a result of the work injury. ICA's opinion at 23, 95 Hawai'i 438, 23 P.3d 773. Further, the ICA noted that there was conflicting medical testimony regarding whether Claimant's condition was caused by the work injury or was solely the result of the 1975 injury, and that, "[i]n instances where the testimony of two doctors directly conflict on the issue of an injury's causal connection to the claimant's employment activity, ... the conflict should be resolved in the claimant's

favor." *Id.* at 30 (citing *Chung v. Animal Clinic, Inc.,* 63 Haw. 642, 652, 636 P.2d 721, 727 (1981)). Therefore, the ICA held that the Board erred in reversing Claimant's PPD award. *Id.* at 31. The ICA also noted that Claimant's symptoms and complications related to his 1975 injury had "for all intents and purposes remitted entirely for about a decade before a similar syndrome arose shortly after his 1991 head injury" and stated that, "[u]nder such circumstances, the suggestion that the 1991 industrial accident aggravated the preexisting condition naturally and ineluctably arises."[2] *Id.* Employer filed a timely application for a writ of certiorari.

## II. DISCUSSION

### A. Standard of review

#### 1. Applications for certiorari

Appeals from the ICA are governed by HRS § 602–59(b) (1993), which states that an

> application for writ of certiorari shall tersely state its grounds which must include (1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the intermediate appellate court with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal.

#### 2. Agency appeals

Appellate review of a LIRAB decision is governed by HRS § 91–14(g) (1993), which states that:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or

---

2. The ICA also affirmed the Board's reduction of Claimant's disfigurement benefit on the ground that there was no basis in the record upon which to review this issue. ICA's opinion at 32. Employer does not challenge the ICA's holding on this issue, and Claimant has not filed an application for certiorari challenging it.

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

We have previously stated:

[FOFs] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. *Alvarez v. Liberty House, Inc.,* 85 Hawai'i 275, 277, 942 P.2d 539, 541 (1997); HRS § 91–14(g)(5).

[COLs] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law. *Hardin v. Akiba,* 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997) (citations omitted); HRS §§ 91–14(g)(1), (2), and (4).

"A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." *Price v. Zoning Bd. of Appeals of City and County of Honolulu,* 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994). When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. *Dole Hawaii Division–Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). "[T]he court should not substitute its own judgment for that of the agency." *Id.* (citing *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)).

*In re Water Use Permit Applications,* 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000) (quoting *Curtis v. Board of Appeals,* 90 Hawai'i 384, 392–93, 978 P.2d 822, 830–31 (1999) (quoting *Poe v. Hawai'i Labor Relations Board,* 87 Hawai'i 191, 197, 953 P.2d 569, 573 (1998))) (alterations in original).

**B. The ICA properly applied the HRS § 386–85(1) presumption to Claimant's case.**

HRS § 386–85 (1993) provides:

In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:

(1) That the claim is for a covered work injury;

(2) That sufficient notice of such injury has been given;

(3) That the injury was not caused by the intoxication of the injured employee; and

(4) That the injury was not caused by the wilful intention of the injured employee to injure oneself or another.

Employer argues that these presumptions only apply "when the issue is whether an injury arises out of and in the course of the employment, *i.e.,* whether the claim is 'compensable' and enforceable under Chapter 386, HRS." Therefore, Employer argues that, because the Director's November 15, 1994 decision already established that Claimant's injury arose out of and in the course of his employment, the presumptions did not apply. Employer argues that, by applying the presumption in the present case, the ICA has held "that when an employee files a written claim for an injury, not only is it presumed that the cause of the injury is work-related, it is now presumed that the employee is permanently disabled. . . ."

Employer's argument is essentially the same as one rejected by this court in *Korsak v. Hawaii Permanente Medical Group, Inc.,* 94 Hawai'i 297, 12 P.3d 1238 (2000). Korsak argued that he had aggravated a preexisting lower back condition during a physical therapy session to treat a compensable work injury and, therefore, that the aggravation was also compensable. Kaiser, Korsak's employer, contended that the aggravation was not compensable because the lower back condition was preexisting. *Id.* at 300, 12 P.3d at 1241. Kaiser argued that the presumption of compensability did not apply to the question

whether an alleged consequence of a work-related injury is compensable. *Id.* at 305, 12 P.3d at 1246. We stated that, "[c]ontrary to Kaiser's assertions that [HRS § 386–85] applies only to 'initial' proceedings or injuries, we construe the use of the word 'any' to mean that the presumption applies in all proceedings conducted pursuant to the workers' compensation chapter." *Id.* at 306, 12 P.3d at 1247 (citation omitted). Therefore, we held that under HRS § 386–85 compensability is presumed in any proceeding for compensation due to an allegedly compensable consequence of a work-related injury. *Id.* at 307, 12 P.3d at 1248.

In the instant case, the hearing to determine Claimant's permanent disability and disfigurement benefits was a proceeding for compensation due to an allegedly compensable consequence of a work-related injury. The issue before the Board was not merely whether and to what extent Claimant was permanently disabled, but also whether the disability was a result of the work injury. Employer's position was that the work injury could not have caused any brain injury or psychiatric disability and that Claimant's ongoing condition was caused by the 1975 injury and other personal and/or psychological stresses. Thus, whether the cause of Claimant's permanent disability was work-related was clearly at issue in the proceedings, and the HRS § 386–85 presumptions applied. *See Korsak,* 94 Hawai'i at 307, 12 P.3d at 1248; *see also Acoustic, Insulation & Drywall, Inc. v. LIRAB,* 51 Haw. 312, 317, 459 P.2d 541, 544 (1969) (holding that circuit court erred in failing to instruct the jury on the statutory presumptions where the issue was whether the physical exertions of the claimant's job aggravated or contributed to his heart condition), *reh'g denied,* 51 Haw. 632, 466 P.2d 439 (1970). The ICA did not err in applying the HRS § 386–85(1) presumption in the present case.

**C. The ICA failed to apply the proper standard of review and to give due deference to the Board's expertise in weighing the credibility of the evidence.**

In order to overcome the HRS § 386–85(1) presumption of work-relatedness, the employer must introduce substantial evidence to the contrary. "The term 'substantial evidence' signifies a high quantum of evidence which, at the minimum, must be 'relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable man that an injury or death is not work connected.'" *Korsak,* 94 Hawai'i at 307–08, 12 P.3d at 1248–49 (quoting *Chung,* 63 Haw. at 650, 636 P.2d at 726). The ICA's opinion did not address whether Employer adduced substantial evidence to overcome the presumption of compensability. Rather, the ICA held that the Board erred in reversing Claimant's PPD award because, under *Chung,* 63 Haw. at 652, 636 P.2d at 727, the conflict between Claimant's and Employer's medical evidence *must,* as a matter of law, be resolved in Claimant's favor. ICA's opinion at 30–31. We hold that the ICA erred insofar as it failed to apply the proper standard of review, and we now address Employer's argument that it adduced substantial credible evidence that Claimant did not suffer any permanent impairment as a result of the 1991 work accident.

The Board relied upon the medical opinions of Drs. Nicholson and Bergmanis in concluding that Claimant was not permanently physically impaired as a result of his 1991 work injury and the opinion of Dr. Bussey in concluding that he was not permanently psychologically impaired as a result of the work injury. In his December 4, 1993 report, Dr. Nicholson stated that there was "no basis to relate any aggravation of the right frontal lobe lesion to the accident of October 3, 1991." In a February 25, 1996 report, Dr. Nicholson opined that Claimant's headaches had a psychological or nonorganic basis, based in part on the fact that the headaches persisted despite surgical removal of the cyst. He also emphasized that, although Claimant reported neck and back symptoms, none of the medical reports shortly after his injury reflected these symptoms. Dr. Nicholson stated that he, Dr. Bergmanis, and Robert Anderson, Ph.D., a neuropsychologist, agreed that the 1991 work injury was a minor injury and that Claimant had not suffered a ratable impairment as a result of the

work injury. Further, he stated that the rating of Thomas Sakoda, M.D., was "completely inconsistent with the injury." Dr. Nicholson noted "probable malingering" and stated that "[a] 1 lb. pot falling 1.5 feet would certainly not produce a significant injury." In fact, he opined that it was "completely irrational to be treating [Claimant] for his multitude of complaints on the basis of the minor injury that he sustained."

In an April 22, 1994 report, Dr. Bergmanis opined that Claimant suffered a "mild, rather non-specific, head injury in the work-related incident of 10/3/91." Although he acknowledged that even minor scalp injuries can lead to "post-traumatic headaches[,]" he opined that Claimant's headaches were "greatly aggravated by pre-existing current psychological and stress factors...." He also stated that the cyst on Claimant's right frontal lobe was compatible with old trauma, was probably associated with the 1975 injury, and did not show evidence of recent hemorrhaging. Further, in his opinion, bleeding was far more likely to be caused by a major head injury than by a minor one.

Dr. Bussey ultimately concluded that Claimant did not have any psychiatric impairment as a result of the work injury. He characterized Claimant's psychiatric impairment as "mild" and opined that it was "related to his underlying organic personality disorder related to his 1975 injury." The ICA also cited the reports of Mark Stitham, M.D., and Dr. Anderson. ICA's opinion at 26–27. Dr. Stitham's September 19, 1993 report indicated that he did not anticipate that Claimant would suffer any permanent impairment as a result of the work injury. He diagnosed Claimant as exhibiting an "[a]djustment disorder with mixed emotional features secondary to protracted legal battle; care of ill mother; and difficulty accepting return to work" and noted "probable symptom exaggeration." Dr. Anderson also noted that Claimant's personality profile indicated that

he "might be presenting an exaggerated picture of his present situation." He opined that it was unlikely that the accident had caused a brain injury because the pot weighed only one pound and fell only approximately one-and-one-half feet.

All of the doctors relied upon by Employer both examined Claimant and reviewed his medical records. Further, Drs. Nicholson, Bergmanis, and Bussey all directly addressed the issue before the Board, i.e., whether Claimant had suffered any permanent impairment that was related to the 1991 work injury, as compared to other factors, and did not give only generalized medical opinions. Compare Korsak, 94 Hawai'i at 308, 12 P.3d at 1249 (doctors' reports only gave generalized medical opinions and did not address whether the claimant's physical therapy session aggravated his back condition). We hold that Employer adduced relevant and credible evidence of a quality and quantity sufficient for a reasonable person to conclude that Claimant's permanent partial disability was not work-related.

However, Dr. Sakoda's report indicated that he diagnosed Claimant as suffering from an arteriovenous (AV) malformation that preexisted the work injury and stated that the cyst was associated with the malformation.[3] According to Dr. Sakoda,

the results certainly indicate that the AV malformation was somehow aggravated by the trauma and there most likely ... was some bleeding into the cyst at that time. This did cause some problems mentally and symptomatically. Postoperatively, he is much improved and this certainly supports the diagnosis of Dr. Hosobuchi.

Dr. Sakoda also opined that Claimant suffered a "hyperextension injury to his neck when struck by the large pot" and noted that another doctor had diagnosed a cervical spine strain.[4] Dr. Sakoda opined that Claimant had suffered an eleven percent impairment of

**3.** Dr. Bergmanis opined that the diagnosis of a cryptic arteriovenous malformation in the frontal lobe cyst was "mere speculation." He stated that only a cerebral angiography would shed light on the problem, but some malformations are so small that they would not appear on any type of test.

**4.** Although he stated that it was not related to the head injury, Dr. Sakoda also diagnosed Claimant as exhibiting carpal tunnel syndrome. When asked his opinion of this diagnosis, Dr. Nicholson stated that there was no evidence to support it.

the whole person as a result of his head injury and a twelve percent impairment of the whole person as a result of the neck injury. Dr. Sakoda did not apportion Claimant's impairment between the work injury and the 1975 injury.

Shepard Ginandes, M.D., a psychiatrist, opined that Claimant had suffered a thirty-five percent psychiatric impairment of the whole person, five percent of which was attributable to the 1975 injury and thirty percent of which was attributable to the work injury. Dr. Ginandes did not observe evidence of malingering or conscious exaggeration of symptoms. The ICA also cited the June 28, 1992 report of James Pierce, M.D., a neurologist, who opined that Claimant's headaches were not related to his 1975 injury. Although he noted that Claimant's records showed that he suffered headaches before the work injury, they "took a rather dramatic change since his accident of October.... [T]he accident combined with the associated stressors are responsible for the majority of his headache problems now."

Drs. Sakoda, Ginandes, and Pierce reported that they had each examined Claimant and reviewed his medical records.[5] Drs. Sakoda and Ginandes specifically addressed the question whether Claimant suffered permanent impairment as a result of the work

injury and did not merely present general medical opinions. However, as noted *supra,* Dr. Sakoda did not address whether any of his impairment ratings were attributable to the 1975 injury.

Once the trier of fact determines that the employer has adduced substantial evidence to overcome the presumption, it must weigh the evidence elicited by the employer against the evidence elicited by the claimant. *Acoustic,* 51 Haw. at 317, 459 P.2d at 544. In the present case, the Board did not expressly address whether Employer had successfully adduced substantial evidence to overcome the presumption of compensability. However, the Board found, based on the opinions of Drs. Nicholson and Bergmanis, that Claimant did not sustain *any* permanent physical impairment as a result of the October 3, 1991 work accident and expressly rejected Dr. Sakoda's opinion on this issue. The Board also found, based on the opinion of Dr. Bussey, that Claimant did not sustain *any* permanent psychological impairment as result of the accident and expressly rejected the opinion of Dr. Ginandes. The Board clearly found Employer's medical evidence to be substantial and more credible than Claimant's medical evidence.[6]

It is well established that

---

5. In the application for certiorari, Employer notes that Dr. Sakoda did not review Claimant's complete medical history in preparing his report. Dr. Sakoda's reports list numerous records that he reviewed, and it is unclear which relevant records he supposedly failed to consider.

6. The dissent would remand the case to the Board because it is unclear whether the Board "(1) applied the reasonable doubt standard, (2) focused on medical evidence which demonstrated the employment incident contributed in any way to the disability and disfigurement, and (3) discounted medical evidence that Claimant's pre-existing condition was a contributing or precipitating cause of the [disability]." Dissent at 5 (internal citations and quotation marks omitted). At the outset, we note that our statement in *Chung* that "the legislature has determined that where there is a reasonable doubt as to whether an injury is work-connected, it must be resolved in favor of the claimant[,]" 63 Haw. at 651, 636 P.2d at 727 (citing *Akamine v. Hawaiian Packing & Crating Co.,* 53 Haw. 406, 409, 495 P.2d 1164, 1166 (1972)), did not create a reasonable doubt *standard.* Where there is a reasonable doubt as to the cause of the claimant's injury, the claimant

must prevail. However, the employer is not required to prove beyond a reasonable doubt that the claimant's injury was not work-related. The proper standard to be applied is whether the employer adduced substantial evidence that the claimant's injury was not work-related. If the Board determines that the employer has adduced substantial evidence, it must weigh the evidence adduced by the employer against the evidence adduced by the claimant.

In the present case, the Board did not expressly address which standards that it applied. However, we have previously stated that "[w]here a trial court does not refer to the burden of proof, 'a presumption arises that it applied the correct [burden].'" *State v. Kotis,* 91 Hawai'i 319, 340, 984 P.2d 78, 99 (1999) (quoting *Crosby v. State Dep't of Budget & Fin.,* 76 Hawai'i 332, 342, 876 P.2d 1300, 1310 (1994) (internal citations and quotation marks omitted)). Thus, we presume that the Board applied the correct standards in the present case.

Further, even without the presumption, there is ample evidence in the record to establish that the Board applied the correct standards. Claimant presented extensive evidence which he ar-

**410**

courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

*In re Application of Hawaiian Elec. Co., Inc.,* 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (quoting *In re Application of Hawai'i Electric Light Co.,* 60 Haw. 625, 629, 594 P.2d 612, 617 (1979)). Therefore, we will not pass upon the doctors' relative credibility.[7]

Giving due deference to the Board's expertise in this area, we hold that there are no grounds upon which to reverse the Board's ruling that Claimant did not sustain any permanent impairment as a result of a work-related injury. Because we hold that the ICA erred in reversing the Board's denial of PPD benefits, we do not reach Employer's remaining argument that the ICA improperly reversed certain Board findings that were not at issue on appeal.[8]

gues established that his impairment was caused by the 1991 work injury. The Board considered this evidence and expressly rejected it; the Board did not unduly "discount" Claimant's evidence. Insofar as the Board expressly found that Claimant had not sustained *any* permanent physical or psychological impairment as a result of the 1991 work injury, it is clear that the Board found that Claimant's work injury did not contribute "in any way" to his permanent impairment. Despite the Board's failure to expressly address the standards it applied, the Board's findings are sufficiently clear to enable the parties and this court to ascertain the basis of the Board's decision.

**7.** In *Chung,* upon which the ICA's opinion relied, this court noted that "[t]he testimony of the two doctors directly conflicted on the issue of the heart attack's causal connection to Dr. Chung's employment activity" and that "the legislature has decided that the conflict should be resolved in the claimant's favor." 63 Haw. at 652, 636 P.2d at 727. However, *Chung* does not, as the ICA's opinion implies, stand for the proposition that *all* conflicts in medical evidence must be resolved in the claimant's favor. In *Chung,* the Board found that the employer had not adduced substantial evidence to support a finding that the heart attack was not work-related and, therefore, resolved the conflicting medical evidence in favor of the claimant. *Id.* at 651, 636 P.2d at 727. Certainly, where the claimant and the employer

## III. CONCLUSION

Based on the foregoing, we reverse the ICA's opinion in part and affirm it in part. We affirm the Board's denial of PPD benefits to Claimant.

OPINION OF ACOBA, J., CONCURRING IN PART AND DISSENTING IN PART

I agree that the Hawai'i Revised Statutes (HRS) § 386–85(1) (1993) presumption that the "claim is for a work covered injury" applies to the determination of permanent partial disability and disfigurement benefits. *See Korsak v. Hawaii Permanente Medical Group,* 94 Hawai'i 297, 306, 12 P.3d 1238, 1247 (2000) (stating that "the use of the word 'any' [in HRS § 386–85(1) ] . . . mean[s] that the presumption applies in all proceedings conducted pursuant to the workers' compensation chapter") (citation omitted). However, even giving "due deference to the [Labor and Industrial Relations Appeals] Board's expertise," majority opinion at 578, the rec-

adduce conflicting medical evidence, but the employer's evidence fails to meet the "substantial evidence" standard, HRS § 386–85 requires that the conflict be resolved in favor of the claimant. However, in the present case, Employer *did* adduce substantial evidence to overcome the presumption of compensability. The ICA erred in relying on *Chung* to resolve the conflicting medical evidence and in failing to give due deference to the Board's expertise in weighing the credibility of the evidence.

**8.** As noted *supra,* Claimant's disfigurement award for his surgical scar is not at issue before this court. However, we note that our holding that Claimant did not suffer permanent partial disability as a result of his 1991 work injury does not require us to *sua sponte* reverse the disfigurement award. In the November 15, 1994 amended decision and order, the Director ruled that Claimant was entitled to TTD benefits as a result of the work injury and that the surgery was necessary to treat Claimant's condition. Employer did not contest the Director's November 15, 1994 decision, and, for purposes of this appeal, we must assume that the Director properly ordered Employer to pay for the surgery as part of the treatment for Claimant's temporary disability. Therefore, Claimant's scar from the surgery may be compensable although he suffered no permanent partial disability as a result of the work injury.

ord does not disclose that the Board appropriately decided the case. Thus, I would remand the case for application of the principles that follow.

HRS § 386–85(1) "creates a presumption in favor of the claimant that the subject injury is causally related to the employment activity." *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 650, 636 P.2d 721, 726–27 (1981) (footnote omitted). The "presumption imposes upon the employer both the heavy burden of persuasion and the burden of going forward with the evidence." *Id.* at 650, 636 P.2d at 726 (citing *Akamine v. Hawaiian Packing & Crating Co.*, 53 Haw. 406, 408, 495 P.2d 1164, 1166 (1972)). To the extent the presumption imposes a "heavy burden of persuasion" upon the employer, *id.* (citation omitted), it is evidentiary in nature and the presumption itself is enough to establish *prima facie* evidence of the causal relationship. Thus, in determining whether the "injury," *i.e.*, the permanent disability and disfigurement claimed in the instant case, is causally related to the employment of Respondent/Claimant–Appellant Darryl Igawa, the Board must begin with the proposition that "coverage [is] presumed at the outset[.]" *Id.* at 651, 636 P.2d at 727. The Board next must determine "whether [any] evidence adduced by the employer is substantial[.]" *Acoustic, Insulation & Drywall, Inc. v. Labor & Indus. Relations Appeal Bd.*, 51 Haw. 312, 317, 459 P.2d 541, 544 (1969). "Substantial evidence" describes the quantum and quality of evidence which the employer must marshal to overcome the presumption. *See Akamine*, 53 Haw. at 408, 495 P.2d at 1166. It "signifies a high quantum of evidence which, at the minimum, must be 'relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work connected.'" *Chung*, 63 Haw. at 650, 636 P.2d at 726 (quoting *Akamine*, 53 Haw. at 408, 495 P.2d at 1166). In that regard, medical evidence "that a pre-existing [condition] may have been a contributing or precipitating cause of the [claimed disability] should be accorded little probative weight." *Id.* at 652, 636 P.2d at 728 (citing *Akamine*, 53 Haw. at 412, 495 P.2d at 1168). Rather, "[t]he primary focus of medical [evidence] for the purposes of determining legal causation

should be whether the employment situation *in any way* contributed to the employee's injury." *Id.* (citation omitted) (emphasis added). If the evidence is substantial, the Board must "weigh and consider the evidence offered by the employer against evidence offered by claimants supportive of the claim." *Acoustic*, 51 Haw. at 317, 459 P.2d at 544. Finally, if, as a result of the weighing, "there is a reasonable doubt as to whether an injury is work-connected, it must be resolved in favor of the claimant." *Chung*, 63 Haw. at 651, 636 P.2d at 727 (citing *Akamine*, 53 Haw. at 409, 495 P.2d at 1166). *See also Survivors of Timothy Freitas, Dec. v. Pacific Contractors Co.*, 1 Haw. App. 77, 85–86, 613 P.2d 927, 932–33 (1980) (holding that "the [Appeals] Board's conclusion[ ][was] supported by substantial evidence which [left] no reasonable doubt as to whether [the claim] was work connected") (footnote omitted). This reasonable doubt standard stems from "the humanitarian nature of the [workers compensation] statute [which] demands that doubt be resolved in favor of the claimant":

> The legislature indeed has cast a heavy burden on the employer in workmen's compensation cases. In its wisdom in formulating public policy in this area of the law, the legislature has decided that work injuries are among the costs of production which industry is required to bear; and if there is reasonable doubt as to whether an injury is work-connected, the humanitarian nature of the statute demands that doubt be resolved in favor of the claimant.

*Akamine*, 53 Haw. at 409, 495 P.2d at 1166.

As the foregoing passage points out, the "heavy burden" created by the statutory presumption in HRS § 386–85(1) embodies the legislature's judgment that "work injuries" should be treated as "among the costs ... industry is required to bear." *Id.* Thus, this court directed that "if" a reasonable doubt exists as to the work-connected nature of the injury, it was mandated, *i.e.*, "demand[ed]" by the statute that the issue "be resolved in favor of the claimant." *Id.* That reasonable doubt rule was confirmed in *Chung*, *see* 63 Haw. at 650–51, 636 P.2d at 727, and most recently reaffirmed in *Korsak*. *See* 94 Ha-

**412**

wai'i at 306, 12 P.3d at 1248. Accordingly, the ascertainment of reasonable doubt is germane to every claim where substantial evidence has been adduced by the employer and work-relatedness is an issue. Inasmuch as its existence compels an outcome favoring the claimant, reasonable doubt is a "standard" to be applied in workers' compensation cases. *See* Black's Law Dictionary 1404 (6th ed.1990) (defining "standard," *inter alia*, as "a measure or rule applicable in legal cases").

Findings and conclusions by an administrative agency in a contested case must be reasonably clear to enable the parties and the court to ascertain the basis of the agency's decision. *See In re Water Use Permit Applications*, 94 Hawai'i 97, 157–58, 9 P.3d 409, 469–70 (citations omitted), *reconsideration denied*, 94 Hawai'i 97, 9 P.3d 409 (2000); *Hawaii Pub. Employment Relations Bd. v. United Pub. Workers, Local 646*, 66 Haw. 461, 472, 667 P.2d 783, 791 (1983); *In re Application of Hawaiian Tel. Co.*, 54 Haw. 663, 668, 513 P.2d 1376, 1379 (1973). It cannot be discerned from the record whether the Board (1) applied the reasonable doubt standard, (2) focused on medical evidence which demonstrated that Claimant's employment incident contributed "in any way" to the disability and disfigurement, *Chung*, 63 Haw. at 652, 636 P.2d at 728 (citation omitted), and (3) discounted medical evidence that Claimant's pre-existing condition was a "contributing or precipitating cause of the [disability]." *Id.* (citation omitted). The majority concedes that "the Board did not expressly address whether [Petitioner/Employer–Appellee Koa House Restaurant and Petitioner/Insurance Carrier–Appellee Pacific Insurance Company] had successfully adduced substantial evidence to overcome the presumption of compensability." Majority opinion at 577. There is no indication the

Board properly appraised the medical evidence within the framework referred to *supra*, and gave effect to any reasonable doubt as to the causal relationship of the disability to the employment incident. The Board's decision and order is entirely devoid of a reference to any of the principles it is required to follow. In the absence of such references, we cannot be "assure[d of] reasoned decision making by the agency[.]" *In re Application of Hawaii Elec. Light Co.*, 60 Haw. 625, 642, 594 P.2d 612, 623 (1979) (citations omitted). *Cf. Survivors of Freitas*, 1 Haw.App. at 85, 613 P.2d at 933 (stating that "[i]n accordance with its responsibilities under [HRS § ] 91–12, the Board should generally state whether or not it has in fact applied the presumption"). In such a context and without more, we cannot discharge our duties of judicial review. While we may defer to the Board's technical expertise in the area assigned to it, there can be no presumption that the Board applied the law correctly. To hold otherwise is an abdication of the power and responsibility allocated to us in the disposition of workers' compensation appeals.[1]

HRS § 91–14(g) (1993), which governs appellate review of the Board's decisions, provides in pertinent part that "[u]pon review of the record the court may ... remand the case with instructions for further proceedings." Therefore, I would remand the case to the Board with instructions to apply the foregoing principles and to make the appropriate findings and conclusions.

---

1. *State v. Kotis*, 91 Hawai'i 319, 984 P.2d 78 (1999), relied on by the majority, and its predecessor, *State v. Aplaca*, 74 Haw. 54, 837 P.2d 1298 (1992), involved appeals from judge-only trials, where it is traditionally presumed, in the absence of contrary evidence, that the judge applies the law correctly. *See, e.g., Ala Moana Boat Owners' Ass'n v. State*, 50 Haw. 156, 159, 434 P.2d 516, 518 (1967) ("Appellant has the burden of sustaining his [or her] allegations of error against the presumption of correctness and regu-

larity that attend the decision of the lower court"); *Estate of Chuck Lee*, 33 Haw. 445, 451–52 (1935) (stating that there is a general presumption in legal proceedings that judicial tribunals act according to law and that "[o]n appeal ... from the decision of an inferior judicial tribunal an appellate court ... presume[s] in review that it has complied with all the requirements of law and that its determination rested on facts sufficient to sustain them").