EUGENE BALDAUF, Claimant-Appellant,
v.
AOAO REGENCY PARK, and DAI-TOKYO ROYAL INSURANCE CO., Employer/Insurance Carrier-Appellee
No. 28646.
Intermediate Court of Appeals of Hawaii.
June 25, 2009.
On the briefs:
Edie A. Feldman, for Claimant-Appellant.
Scott G. Leong, Shawn L.M. Benton, (Leong Kunihiro Leong & Lezy), for Employer/Insurance Carrier-Appellee.

MEMORANDUM OPINION
FOLEY, Presiding Judge, FUJISE, and LEONARD, JJ.
Claimant-Appellant Eugene Baldauf (Baldauf) appeals from a June 12, 2007 Decision and Order of the Labor and Industrial Relations Appeals Board (the LIRAB). The LIRAB ruled in favor of Employer/Insurance Carrier-Appellee AOAO Regency Park and Dai-Tokyo Royal Insurance Co. (collectively, Employer) on Baldauf's workers' compensation claim, reversing the decision of the Director (Director) of the Department of Labor and Industrial Relations (DLIR), who had approved surgery on and Synvisc injections to Baldauf's right knee.

I. BACKGROUND
On November 27, 2001, Baldauf suffered an injury to his right knee (11/27/01 injury) in the course of his employment as the security chief at the Regency Park Condominium. Baldauf was 63 years old at the time of his injury. Patricia Walcyk, D.O., (Dr. Walcyk) initially diagnosed Baldauf with a ligament strain and possible derangement of the right knee. On March 21, 2002, Dr. Walcyk further diagnosed a meniscal tear to and degenerative arthritis of Baldauf's right knee. After further complaints by Baldauf of knee pain and other symptoms, a first arthroscopy procedure of the knee was performed by Jerry Van Meter, M.D. (Dr. Van Meter), an orthopedic surgeon, on April 22, 2002 with the approval of Employer. Employer approved physical therapy from April 30, 2002 to July 11, 2002. On July 15, 2002, Dr. Van Meter reported that the right knee was stable post-arthroscopy, Baldauf's current complaints were due to pre-existing degenerative joint disease, and Baldauf was at maximum medical improvement.
Baldauf received a permanent partial disability rating of 20% of the lower extremity from Lance Yokochi, M.D. (Dr. Yokochi), an occupational medicine specialist, on October 3, 2002, and on April 21, 2003, Baldauf received from Christopher Brigham, M.D. (Dr. Brigham), an occupational medicine specialist and disability evaluation expert, a second permanent impairment rating of 10% of the lower extremity.
Dr. Yokochi and Terry Vernoy, M.D. (Dr. Vernoy), an orthopedic surgeon, opined that the arthritis either was not symptomatic or present prior to the 11/27/01 injury and the arthritis was thereafter accelerated or was secondary to the 11/27/01 injury. Dr. Brigham and Frank Izuta, M.D. (Dr. Izuta), an occupational medicine specialist, determined that the arthritis was pre-existing and unrelated to the 11/27/01 injury.
On August 8, 2003, Baldauf still experienced pain, swelling, and his knee "giving way," and Dr. Vernoy recommended a repeat arthroscopy. That procedure was denied by Employer.
After a hearing before the DLIR on the repeat arthroscopy issue, the Director issued a decision on April 12, 2004 that the repeat arthroscopy on Baldauf's right knee was reasonable in light of Dr. Vernoy's January 21, 2004 opinion that Baldauf did not have osteoarthritis at the time of his injury, subsequent arthritic changes were due to the 11/27/01 injury, and Baldauf needed additional medical care due to continuing complaints.
On April 30, 2004, Employer appealed the Director's April 12, 2004 Decision to the LIRAB. Employer's motion to stay the Decision was denied by the LIRAB.
On July 1, 2004, Baldauf obtained the repeat arthroscopy surgery.
On October 22, 2004, Dr. Vernoy recommended that Baldauf receive Synvisc injections for treatment of right knee pain. Employer denied the treatment. Baldauf moved to temporarily remand the case from the LIRAB to the DLIR, and the LIRAB granted the remand. After a hearing, the Director issued an August 1, 2005 Supplement to the April 12, 2004 Decision and approved the Synvisc injections, finding that Baldauf suffered from an industrial right knee arthritic condition. On August 5, 2005, Employer approved the Synvisc injections and appealed to the LIRAB from the Director's August 1, 2005 Supplement.
While the appeal was pending before the LIRAB, Employer denied on April 24, 2006 Baldauf's request for a total knee arthroplasty. Baldauf's motion to remand the matter to the DLIR for a review of whether additional surgery was necessary was denied by the LIRAB. The LIRAB also denied Baldauf's motion for reconsideration.
Employer scheduled the deposition of Dr. Van Meter for July 17, 2006 and held the deposition as scheduled, even though Baldauf's counsel informed Employer that counsel was unable to attend because counsel had not received reasonable notice of the deposition. On July 24, 2006, Baldauf filed a motion, asking the LIRAB to allow Baldauf to depose Dr. Van Meter at Employer's expense or, in the alternative, to strike the July 17, 2006 deposition. The LIRAB denied the motion.
On August 11, 2006, Employer filed a Motion in Limine (Motion in Limine) to exclude certain documents pertaining to Baldauf's work activities and any testimony by witnesses at trial to support an argument that Baldauf sustained a cumulative trauma injury as opposed to a discrete injury on November 27, 2001 because Baldauf had not filed a claim for a cumulative trauma type of injury.
Prior to the start of trial, Baldauf filed and submitted to the LIRAB an August 14, 2006 Supplemental Report by Dr. Yokochi (8/14/06 Report) regarding the development and aggravation of Baldauf's osteoarthritis due to Baldauf's job duties and a PubMed article (PubMed Article) summarizing risk factors that enhance osteoarthritis. The LIRAB granted Employer's Motion in Limine and ruled that no testimony regarding Baldauf's cumulative trauma injury would be allowed. The LIRAB denied admission into evidence of the 8/14/06 Report as untimely and duplicative of other evidence and the PubMed Article as untimely and without sufficient foundation. The LIRAB granted Baldauf leave to file an offer of proof as to Dr. Yokochi's report and the PubMed article as part of Baldauf's position statement.
Subsequent to trial, Baldauf and Employer submitted post-trial position statements. Baldauf relied on Dr. Yokochi's report and the PubMed article; attached those documents to his statement as Exhibits S and T, respectively; and included argument as to his activities pre- and post-trauma as relevant to his knee condition.
Employer moved to strike Baldauf's post-trial position statement for, inter alia, including inadmissible evidence and argued for sanctions, including an award of attorney's fees and costs for bringing the motion. On October 11, 2006, the LIRAB filed an Order Granting Motion to Strike in Part, striking the exhibits and any reference to the exhibits and awarding attorney's fees and costs to Employer for preparation of the motion.
On October 23, 2006, Baldauf filed a motion for reconsideration of the Order Granting Motion to Strike in Part. On November 15, 2006, the LIRAB denied Baldauf's motion for reconsideration.
On June 12, 2007, the LIRAB entered its Decision and Order, reversing the Director's decisions that had authorized repeat arthroscopic surgery and Synvisc injections for treatment of Baldauf's right knee pain.
On appeal, Baldauf contends:
(1) The LIRAB's Conclusions of Law (COLs) 1 and 2 that the requested surgery and Synvisc injections were neither reasonable nor necessary for Baldauf's 11/27/01 injury were wrong because COLs 1 and 2 were based upon the following erroneous Findings of Fact (FOFs):
(a) FOF 31, which stated that Synvisc is a form of viscosupplementation used to treat severe knee arthritis by injection directly into the affected knee;
(b) FOF 32, which stated that Dr. Vernon submitted a treatment plan dated January 4, 2005 to Employer;
(c) FOF 37, which stated that Baldauf "had degenerative arthritis of the right knee that pre-existed his [11/27/01] work injury";
(d) FOF 38, which stated that Baldauf sustained an "MCL strain/sprain of his right knee as a result of his [11/27/01] work injury" and Baldauf's "need for further medical treatment for his right knee complaints was related to his pre-existing degenerative arthritis";
(e) FOF 39, which stated that, in approving the surgery, the Director relied on Dr. Vernoy's opinion "that the repeat arthroscopy was related to the [11/27/01] work injury," which opinion "was based upon the untenable belief and erroneous logic that [Baldauf] did not have osteoarthritis in his right knee at the time of his [11/27/01] work injury";
(f) FOF 40, which stated that, in approving the Synvisc injections, the Director relied upon Dr. Vernoy's chart notes that Baldauf "needed the Synvisc injections for his work-related right knee condition" although the notes confirm that the injections "were required for continued right knee complaints attributable to [Baldauf's] pre-existing degenerative arthritis and not to his [11/27/01] work injury";
(g) FOF 41, which stated that: (i) the LIRAB was "not deciding a claim for osteoarthritis or a claim for a pre-existing degenerative knee joint worsened by work-connected cumulative trauma," but that Baldauf's claim was "for a discrete and specific injury to his right knee" that was "an MCL strain/sprain"; (ii) Dr. Vernoy's opinion that "relied primarily upon an unclaimed cumulative trauma theory of recovery" was "neither relevant nor probative on the issues in this appeal"; and (iii) although "evidence may have been construed in a manner more favorable to [Baldauf] if a cumulative trauma theory of recovery was presented," when the LIRAB addressed the issue in limine, "[Baldauf's] attorney specifically represented to [the LIRAB] that a cumulative trauma theory of recovery was not being pursued";
(h) FOF 42, which stated that "[Baldauf's] need for the requested surgery and the Synvisc injections was related to the natural progression of his pre-existing right knee degenerative arthritis and not to his [11/27/01] work injury";
(i) FOF 43, which stated that "[t]he requested surgery and Synvisc injections were therefore neither reasonable nor necessary treatment for [Baldauf's 11/27/01] work injury.
(2) The LIRAB abused its discretion when it made the following interlocutory rulings:
(a) Order Denying Motion for Remand, which denied remand to address the denial of surgery, and Order Denying Motion for Reconsideration of Order Denying Motion for Remand Filed June 19, 2006.
(b) Order Denying Motion to Compel Deposition of [Dr. Van Meter] To Be Taken at Employer/Carrier's Expense Due to Lack of Proper Notice; or, in the Alternative, Motion to Strike Deposition Transcript of [Dr. Van Meter] Taken on July 17, 2006, which denied the motion to compel the deposition of one of Employer's medical witnesses or, alternatively, to strike the deposition for lack of notice.
(c) Oral orders striking Dr. Yokochi's 8/14/06 Report (Baldauf's Exhibit 7 in evidence) and the PubMed Article (Baldauf's Exhibit 8 in evidence) as untimely.
(d) Oral order granting Employer's Motion in Limine and excluding Baldauf's witnesses from testifying.
(e) Order Granting Motion to Strike in Part, which struck from the record the 8/14/06 Report and the PubMed Article attached respectively as Exhibits S and T to Baldauf's post-hearing position statement and all references and arguments in his statement relating to the two exhibits; Order Denying [Baldauf's] Motion for Reconsideration; and order approving Employer's request for attorney's fees for preparation of the Motion to Strike.

II. STANDARD OF REVIEW
Appellate review of a LIRAB decision is governed by HRS § 91-14(g) (1993), which states that:
Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
We have previously stated:
[Findings of Fact] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record.
[Conclusions of Law] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law.
A [Conclusion of Law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency.
Igawa v. Koa House Rest., 97 Hawai`i 402, 405-06, 38 P.3d 570, 573-74 (2001) (internal quotation marks, citations, and brackets in original omitted) (quoting In re Water Use Permit Applications, 94 Hawai`i 97, 119, 9 P.3d 409, 431 (2000)).

III. DISCUSSION
The December 2, 2001 WC-1 Employer's Report of Industrial Injury reflected Baldauf's 11/27/01 injury as follows.
Injury occurred in the process of checking out a damage in Bldg. 2 hallway wall with Maintenance Supervisor. As I stepped out, firmly planting my right foot on the ground, I turned to my left and felt a pull & a pain in my right knee resulting in a loss of feeling & control. Therefore, placing all my weight on left leg. Walking was not possible on Right leg and pressure could only be applied to ball of foot.
Employee was walking and making a change in direction, which caused injury.
(Emphasis added.)
In December 2001, Baldauf reported that his knee pain was aggravated by walking, standing or squatting. On January 22, 2002, after a course of physical therapy, Baldauf reported a pulling sensation at the back of the knee, but no pain or locking, and a decrease in swelling, and Dr. Walcyk released Baldauf to full-duty work status. By March 7, 2002, Baldauf reported continued swelling and locking of his knee, causing pain, and that he was on light-duty work status. On March 21, 2002, Baldauf again reported pain. As of April 2, 2002, Baldauf reported that the swelling continued, his pain was worse than since the onset of the injury, and walking up stairs aggravated his knee.
Dr. Van Meter performed the first arthroscopy, approved by Employer, on Baldauf's knee on April 22, 2002. Baldauf engaged in Employer-approved physical therapy from April 30, 2002 through July 11, 2002. On July 15, 2002, Dr. Van Meter reported that Baldauf's right knee was stable post-arthroscopy and Baldauf was at maximum medical improvement.
As of July 30, 2002, Baldauf reported that his knee continued to be sore, and Dr. Walcyk placed Baldauf on light-duty status and stated that he was ready for a permanent partial disability (PPD) rating.
On October 3, 2002, Dr. Yokochi made a permanent partial disability rating of 20% of the lower extremity, and on April 21, 2003, Dr. Brigham issued a differing impairment rating of 10%.
On August 8, 2003, Baldauf was still experiencing pain, swelling, and his knee giving way, and Dr. Vernoy recommended a repeat arthroscopy. As of October 29, 2003, Baldauf apparently still experienced continued persistent discomfort. Dr. Vernoy performed the repeat arthroscopy procedure on July 1, 2004.
On September 23, 2004, Dr. Vernoy recommended a series of Synvisc injections in Baldauf's right knee to treat his pain, but Employer denied the treatment.
In matters before the Director, Baldauf maintained ongoing pain in a letter of January 23, 2004 and presented a January 21, 2004 report from Dr. Vernoy that Baldauf "most likely continues to have difficulty with deep squatting, going up and down stairs and ladder climbing . . . [and] . . . may be attempting to continue his activities, including work, despite his pain." As to the Synvisc injections, Baldauf asserted on April 3, 2005 that "because of the pain in his knee, [he] must use a wheelchair at work in order to do his job." Dr. Vernoy's January 4, 2005 report reflected that Baldauf "complains of pain with weight bearing and on deep squatting." Dr. Vernoy's February 3, 2005 report stated that Baldauf "still has some pain and swelling with increased activities. He uses a wheelchair or scooter at work. He walks with a cane to go up and down stairs." On March 8, 2005, Baldauf argued with respect to the requested Synvisc injections that he had been asymptomatic prior to the industrial injury. Dr. Vernoy's March 3, 2005 report noted that Baldauf "still has pain and swelling with activities. He is doing light duty work."
Clifford Lau, M.D., an orthopedic surgeon, and Dr. Izuta opined that Baldauf's continued right knee problems were due to his underlying arthritic condition and not the 11/27/01 injury. Dr. Lau and Dr. Izuta also opined that the surgery performed by Dr. Vernoy was unrelated to the 11/27/01 injury. Kent Davenport, M.D., an orthopedic surgeon, indicated that the 11/27/01 injury was most likely a knee strain superimposed upon severe pre-existing degenerative arthritis. Dr. Davenport also testified that the second surgery was not necessitated by the 11/27/01 injury.
Before the LIRAB, Employer argued in essence that testimony of cumulative trauma was irrelevant in a claim of discrete injury to the knee and that no claim had been filed for any cumulative trauma injury involving work activities causing aggravation of Baldauf's underlying osteoarthritis. Baldauf argued that his job required his walking up and down stairs and across the apartment complex; prior to November 27, 2001, he had not suffered knee problems; he had to avoid climbing or descending stairs or his knee would buckle; since the injury, he had not been able to work without apparatus for support; and his condition had worsened. Baldauf asserted that his "knee has not improved"; "details of [his] work activity [are] relevant to the need for future treatment, including surgery"; his job description "is highly relevant evidence"; "repetitive, ongoing use of his knee for the last 21 years is . . . highly relevant evidence" his "knee has never gotten better, it has gotten progressively worse" and "nothing has changed"; and "he has never stopped complaining about his knee ever since [the 11/27/01 injury]." Baldauf acknowledged the language of the WC-1 claim, but argued that work activity was relevant to the claim and he was not making a fundamental change in theory of the case.
The LIRAB ruled in relevant part:
Had there been an opportunity or a motion before us to amend the pretrial order to expand the scope of causation to include accumulative trauma claim, perhaps the Board would be inclined to rule differently.
Again, we will give you the option of whether or not you choose to make an offer of proof as part of your final position statement on this particular point. I am sure this will be a very interesting one. But the [LIRAB] is persuaded by the fact that the material included in the WC-1, which is not disputed by [Baldauf], establishes a discrete injury and, as such, makes any other theory of recovery of portionable [sic] applicability to the case.
Baldauf asserted knee pain and other symptoms in his 11/27/01 injury claim. At that time, causation for the knee condition had not been determined. From the initiation of his claim, and before any disability rating was obtained, Baldauf had complaints of knee pain and also stated that his work activity had aggravated his knee condition. From the time Baldauf obtained his disability ratings to the date of the LIRAB August 15, 2006 hearing, he continued to complain about his knee condition and to assert that work exacerbated his condition. Consequently, a theory of cumulative trauma can reasonably be inferred as existing within Baldauf's initial claim, particularly where Baldauf's initial claim remained open during the time pre-existing arthritis arose as a potential cause for Baldauf's knee condition, thus obviating the need for any separate claim of cumulative trauma.
If the knee condition was caused by the mixed risk of the pre-existing arthritis combined with an employment cause, the question is whether employment was a contributing factor. Miyamoto v. Wahiawa Gen. Hosp., 101 Hawai`i 293, 308-09, 67 P.3d 792, 807-08 (App. 2003). Stated differently, although the pre-existing arthritis may have been a contributing cause of Baldauf's knee condition  in addition to the knee sprain or strain  the only relevant inquiry is whether the knee condition was aggravated or accelerated by work activity. Chung v. Animal Clinic, Inc., 63 Haw. 642, 651-52, 636 P.2d 721, 727-28 (1981). In light of the foregoing, any subsequent injury inquiry was not the dispositive inquiry, including the inquiry of whether any knee-twisting injury "precipitated" or "activated" the pre-existing asymptomatic latent arthritis, as was the focus of Bocalbos v. Kapiolani Medical Center for Women & Children, 93 Hawai`i 116, 131-32, 997 P.2d 42, 57-58 (App. 2000). In determining the necessity and reasonableness of treatment, the LIRAB focused on whether the November 27, 2001 knee sprain or strain was related to the requested treatment for pre-existing arthritis. As such, the LIRAB did not engage in the dispositive inquiry of whether Baldauf's knee condition  whether caused by pre-existing arthritis or by a knee sprain or strain  was aggravated or accelerated by work activity.
Because the LIRAB did not focus upon the correct dispositive inquiry, we vacate the June 12, 2007 Decision and Order. In light of this, the remaining points of error addressing interlocutory orders need not be addressed.

IV. CONCLUSION
The LIRAB's June 12, 2007 Decision and Order is vacated, and this case is remanded for proceedings consistent with this memorandum opinion.